UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CHRISTINE BALKO,                                  :

               Plaintiff,                       :          13 Civ. 1333 (LAK) (AJP)

         -against-                            :          **REPORT AND RECOMMENDATION**

UKRAINIAN NATIONAL FEDERAL CREDIT      :
UNION,
                               :
              Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANDREW J. PECK, United States Magistrate Judge:**

**To the Honorable Lewis A. Kaplan, United States District Judge:**

        Plaintiff Christine Balko brings this action against her former employer, the

Ukrainian National Federal Credit Union ("UNFCU"), alleging violations of the whistleblower

protections of the Federal Credit Union Act ("FCUA"), 12 U.S.C. § 1790b(a)(1).  (Dkt. No. 1:

Compl. ¶¶ 127-34.)  Balko asserts that she was unlawfully terminated in retaliation for reporting

possible legal and regulatory violations to the National Credit Union Administration ("NCUA").

(Compl. ¶¶ 130-31.)  Presently before the Court is UNFCU's summary judgment motion.  (Dkt. No.

31: Notice of Motion.)  For the reasons set forth below, UNFCU's motion should be DENIED.

## FACTS

### The Parties

        UNFCU is a federally insured credit union governed by the FCUA as administered

by the NCUA.  (Dkt. Nos. 34 & 37: UNFCU & Balko Rule 56.1 Stmts. ¶ 1.)[1]  UNFCU's Board of

---

[1]    See 12 U.S.C. §§ 1752a(a); accord, e.g., Gully v. Nat'l Credit Union Admin. Bd., 341 F.3d
    155, 163 (2d Cir. 2003) ("Federal credit unions are governed by the Federal Credit Union
                                (continued...)

2

Directors ("BOD" or "Board") is responsible for the general direction and control of UNFCU, and is empowered to delegate the execution of operations to UNFCU personnel.  (UNFCU & Balko Rule 56.1 Stmts. ¶¶ 2, 4.)  The UNFCU Board is comprised of volunteer members and a compensated chairman, elected from within UNFCU's Ukrainian membership.  (UNFCU & Balko Rule 56.1 Stmts. ¶¶ 2-3, 7.)

In 2005, the UNFCU Board hired Balko as UNFCU's General Manager—a high management position at that time, junior only to the President and Board.  (UNFCU & Balko Rule 56.1 Stmts. ¶ 5; Dkt. No. 37: Balko Rule 56.1 Counter-Stmt. ¶ 135; Dkt. No. 36: Hans Aff. Ex. 2: 2003 UNFCU Org. Chart.)  As General Manager, Balko was responsible for running UNFCU and overseeing its day-to-day operations.  (UNFCU & Balko Rule 56.1 Stmts. ¶ 8.)

Balko was terminated as General Manager in September 2009.  (UNFCU & Balko Rule 56.1 Stmts. ¶ 9; Balko Rule 56.1 Counter-Stmt. ¶ 137.)  From approximately September 2009 through February 26, 2010, Balko served as Acting CEO.  (UNFCU & Balko Rule 56.1 Stmts. ¶ 17; Balko Rule 56.1 Counter-Stmt. ¶¶ 146, 152.)  In March 2010, Balko was elected chairman of the Board, and in April 2010 she became UNFCU's CEO.  (UNFCU & Balko Rule 56.1 Stmts. ¶¶ 21-23; Hans Aff. Ex. 1: Balko Dep. at 13-15.)  As CEO, Balko's responsibilities included "adher[ing] to proper protocol and the policies of the Board," "ensuring that the laws and regulations that govern a federal credit union [we]re complied with" and "'overseeing the operations' of the credit union." (Balko Dep. at 15-16; Balko Rule 56.1 Counter-Stmt. ¶¶ 147, 339.)

---

(...continued)
    Act ('FCUA'), and administered by a federal agency, the NCUA." (citations omitted)).

**Balko's 2006 Report to the NCUA**

In 2006, Balko informed NCUA Examiner Janice Zanelloti that UNFCU had been working under a dual charter for the past fourteen years in violation of NCUA regulations.  (Dkt. No. 37: Balko Counter-Stmt. ¶¶ 141, 151; Dkt. No. 36: Hans Aff. Ex. 1: Balko Dep. at 28, 31-32; see Dkt. No. 35: UNFCU Br. at 4 n.3.)  The NCUA was shocked and instructed Balko to cure the situation within three months, which she did.  (Balko Dep. at 32.)  UNFCU suspended Balko following her disclosure.  (Balko Dep. at 30.)

**Balko's 2009 Reports to the NCUA**

In 2009, Balko "provided information to the NCUA about the extreme turmoil regarding investments, day to day operations, and lack of any internal controls," as follows:

> 153.  Plaintiff communicated with NCUA Examiners Brian McDonough and Mark Cantor in 2009 prior to the issuance of the governance model that it had become impossible to perform her job due to the Board taking over the operation of the credit union.  Additionally, she informed them that there were cash and general ledger issues at the South Bound Brook Branch ("SBB"), and tellers' identifications were compromised. . . .
>
> . . . .
>
> 155.  Essentially, the issues in 2009 were that "the Board . . . wanted to take control of the institution for their own personal reasons."  They would manipulate money involved with investments.  The Board demanded that the Plaintiff ignore federal banking regulations or face termination. . . .
>
> . . . .
>
> 188.  In 2009, the genesis of what was reported to the NCUA was: the lack of investment strategy, election process violated, and Board issues concerning the governing of the credit union.

(Dkt. No. 37: Balko Rule 56.1 Counter-Stmt. ¶¶ 151, 153, 155, 188; see id. ¶¶ 138, 140, 142, 145; Dkt. No. 36: Hans Aff. Ex. 1: Balko Dep. at 28, 32-37, 337-40, 343-45; Dkt. Nos. 34 & 37: UNFCU & Balko Rule 56.1 Stmts. ¶ 8; Dkt. No. 35: UNFCU Br. at 4 n.3.)

**March 31, 2009 NCUA Examination Report and Letter of Understanding**

      The NCUA examined UNFCU as a result of Balko's communications with Examiners Brian McDonough and Mark Kanter, and on March 31, 2009, NCUA Examiner McDonough issued an examination report.  (Dkt. No. 36: Hans Aff. Ex. 4: 3/31/09 NCUA Exam. Rep.)  The following is a sampling of the "violations of law or regulation" listed in the NCUA's ten-page schedule of Examiner's Findings:

> You violated your bylaws during the most recent board of elections. . . .
>
> . . . .
>
> The credit union amended and the board approved the investment policy which allows the credit union to invest in <u>interest-only mortgage backed securities. These are impermissible investments per NCUA regulations.</u>
>
> . . . .
>
> Your internal control systems are weak and ineffective.  During the examination it was determined that the Mgr at the So. Bound Brook, New Jersey branch was violating credit union policy by improperly cashing checks, conducting transactions on the vault, and using other[] tellers['] passwords to process transactions.  This had apparently been going on for quite some time. . . .
>
> . . . .
>
> You have not developed a Security policy for the credit union.  Per NCUA rules and regulations you must develop a written security program within 90 days of the effective date of insurance (NCUSIF).
>
> . . . .
>
> You have not documented the board's review, updating or approval of the Bank Secrecy Act policy since May of 2007.  These policies should be reviewed at least annually to ensure they contain the latest regulatory updates, and are still sufficient for your credit union.

(Hans Aff. Ex. 4: 3/31/09 NCUA Exam. Rep. at 13, 16-17, 20; <u>see id.</u> at 12-21.)  Examiner McDonough also made the following findings regarding UNFCU's operations:

> Operationally, your credit union lacks a coherent management structure and is dysfunctional.  Your board members, volunteers, frequently take on the responsibilities of operating management, and interfere in the day to day operations of the credit union.  The board of directors consistently set policy and procedure and attempt to implement procedure which is beyond the purview of their responsibilities.
>
> . . . .
>
> Your organizational structure is seriously flawed, there is no Governance policy, and the Board of Directors exerts improper influence and inappropriate control over the day-to-day management activities of the credit union.

(3/31/09 NCUA Exam. Rep. at 2, 12; see Dkt. Nos. 34 & 37: UNFCU & Balko Rule 56.1 Stmts. ¶ 11; Dkt. No. 37: Balko Rule 56.1 Counter-Stmt. ¶¶ 158, 160.)  Examiner McDonough further concluded that Balko could not be held responsible for performance inadequacies in light of the UNFCU's lack of structure, including the absence of clearly defined job responsibilities.  (UNFCU & Balko Rule 56.1 Stmts. ¶¶ 10, 12; Balko Rule 56.1 Counter-Stmt. ¶¶ 143, 159; 3/31/09 NCUA Exam. Rep. at 3-4, 12.)

As a result of Examiner McDonough's report, the NCUA and UNFCU entered into a Letter of Understanding ("LUA"),[2] which identified "significant adverse conditions" in UNFCU's operations, and required UNFCU to establish a CEO position and adopt a Governance Model. (UNFCU & Balko Rule 56.1 Stmts. ¶ 13; Balko Rule 56.1 Counter-Stmt. ¶¶ 156, 159, 162; Hans Aff. Ex. 5: 3/31/09 NCUA Letter of Understanding: "This Letter of Understanding and Agreement sets forth significant adverse conditions identified by the National Credit Union Administration as

---

[2]    Both the NCUA Examination Report and LUA are on letterhead from "National Credit Union Administration – Region I," with the following address: 9 Washington Square, Washington Avenue Extension, Albany, NY 12205.  (Hans Aff. Ex. 4: 3/31/09 NCUA Exam. Rep.; Hans Aff. Ex. 5: 3/31/09 NCUA Letter of Understanding.)

a result of its examination of the Ukrainian National Federal Credit Union, dated March 31, 2009, and the agreements reached with the credit union's officials to resolve them.")[3]

**UNFCU's New Governance Structure**

UNFCU adopted a new Governance Model in accordance with the LUA in September 2009, eliminating the General Manager position and creating a CEO position. (Dkt. Nos. 34 & 37: UNFCU & Balko Rule 56.1 Stmts. ¶¶ 15-16; Dkt. No. 37: Balko Rule 56.1 Counter-Stmt. ¶ 146; Dkt. No. 36: Hans Aff. Ex. 1: Balko Dep. at 11.) Balko served as Acting CEO until February 26, 2010, when the UNFCU Board hired Kenneth Frederickson as CEO. (UNFCU & Balko Rule 56.1 Stmts. ¶¶ 17, 19-20; Balko Rule 56.1 Counter-Stmt. ¶ 146.) Despite Balko's qualifications, the Board did not consider her for the permanent CEO position. (UNFCU & Balko Rule 56.1 Stmts. ¶ 19; Balko Rule 56.1 Counter-Stmt. ¶ 148.)

In March 2010, Balko and several new members were elected to UNFCU's Board, and Balko was elected chairwoman. (UNFCU & Balko Rule 56.1 Stmts. ¶¶ 21-22; Balko Dep. at 13-14.) The new Board agreed that CEO Frederickson should assume the CFO position and chairwoman Balko should assume the CEO position, which she did in April 2010. (UNFCU & Balko Rule 56.1 Stmts. ¶ 23; Hans Aff. Ex. 1: Balko Dep. at 12-15.) As CEO, Balko developed contentious relationships with certain Board members, especially regarding the new Governance Model implementation. (UNFCU & Balko Rule 56.1 Stmts. ¶¶ 26-30; Balko Rule 56.1 Counter-Stmt. ¶¶ 163-64; Hans Aff. Ex. 3: Sullivan Dep. at 54, 56, 61, 63-64, 66-67.) Balko had a particularly adversarial relationship with Board member and UNFCU co-founder Vsevolod Salenko.

---

[3]    The parties dispute whether the implementation of the new governance model was a legal obligation. (UNFCU & Balko Rule 56.1 Stmts. ¶ 14; see Hans Aff. Ex. 3: Sullivan Dep. at 18, 64-65; Balko Rule 56.1 Counter-Stmt. ¶¶ 156, 159, 163, 165.)

(UNFCU & Balko Rule 56.1 Stmts. ¶ 28; Balko Rule 56.1 Counter-Stmt. ¶¶ 136, 163-64, 210-11, 341; Sullivan Dep. at 56; Hans. Aff. Ex. 25: 1/4/12 Balko Email.)  On the other hand, Balko had an allegiance with Walter Drobenko—who was elected to the Board with Balko in March 2010 and later elected chairman in April 2011.  (UNFCU & Balko Rule 56.1 Stmts. ¶ 33; Balko Rule 56.1 Counter-Stmt. ¶¶ 230, 346-47; Hans Aff. Ex. 1: Balko Dep. at 386-88; Sullivan Dep. at 95-96; Hans Aff. Ex. 7: Drobenko Dep. at 8-13; Hans. Aff. Ex. 25: 1/4/12 Balko Email.)

**Balko's 2011 Reports to the NCUA**

Beginning in September 2011, Balko began providing information to NCUA Examiner Ryan Sullivan regarding fraudulent conduct she discovered involving UNFCU members' accounts at the SBB branch.  (Dkt. Nos. 34 & 37: UNFCU & Balko Rule 56.1 Stmts. ¶¶ 106-07, 109; Dkt. No. 37: Balko Rule 56.1 Counter-Stmt. ¶¶ 166, 168, 174, 176, 189, 218; Dkt. No. 36: Hans Aff. Ex. 1: Balko Dep. at 28, 39-41, 44; see Dkt. No. 35: UNFCU Br. at 4 n.3.)  Balko discussed the fraud with UNFCU's CFO, Supervisory Committee and Board, and informed them that NCUA Examiner Sullivan determined that a forensic audit was necessary due to the seriousness of the fraud.  (UNFCU & Balko Rule 56.1 Stmts. ¶ 109-12; Balko Rule 56.1 Counter-Stmt. ¶¶ 167, 169-71, 173, 177, 189; Balko Dep. at 44, 361-63.)  Thereafter, members of the Supervisory Committee resigned and Board members, including Salenko, instructed Balko to stop investigating the fraud and expressed frustration with Balko's continued communications with NCUA personnel.  (Balko Rule 56.1 Counter-Stmt. ¶¶ 171-72, 175, 179-80, 189, 202-08, 220-23, 227, 233, 235-41, 263, 340-41; Hans Aff. Ex. 7: Drobenko Dep. at 15-27.)

UNFCU retained auditing firm Clifton Larson Allen ("CLA") to conduct a forensic investigation into the alleged fraud at the SBB branch.  (UNFCU & Balko Rule 56.1 Stmts. ¶ 110; Balko Rule 56.1 Counter-Stmt. ¶ 177; Dkt. No. 33: Davidoff Aff. Ex. 23: 9/21/11 CLA Engagement

Letter.)  Balko worked at the SBB branch during this time to assist CLA with the audit.  (Balko Rule 56.1 Counter-Stmt. ¶¶ 178, 181; Balko Dep. at 64-67, 367-69; Drobenko Dep. at 17, 19-22.)  CLA issued three periodic audit reports on November 17, 2011, December 21, 2011 and May 31, 2012.  (UNFCU & Balko Rule 56.1 Stmts. ¶¶ 113-14; Balko Rule 56.1 Counter-Stmt. ¶ 182.)

### November 17, 2011 CLA Audit Report

CLA issued its first summary status report approximately two months into the SBB branch audit, reporting the following findings:

> Certain front line non-exempt employees advised management in interviews that a supervisor required them to surrender their teller passwords.  Employees have authorized wire or loan transactions based on documentation that was incomplete or unsubstantiated.  Required procedures for inspections, verification or callbacks were not completed. . . .  Wire transfers and Western Union money transfers were done without proper documentation or verification.  Multiple share secured loans were issued with forged signatures which were eventually repaid all without the consent or approval of the members. . . .

> One member service representative, suspected to be the leading force in this activity has been suspended and subsequently removed from her position as a result of the investigation in the past few months.  Suspicious Activity Reports have been filed as required by regulation to report suspect illegal transactions.   Other employees involved to a lesser extent are still employed at the credit union and pose a risk of loss to the credit union and members until removed.

> Credit Union internal controls over loan disbursement, wire transfers, teller password security, in large measure have proven ineffective due to the lack of adequate enforcement and monitoring.

> Employees and management have reportedly been threatened, vandalized, assaulted and harassed in connection with the investigation.

> . . . .

> We will continue to document this case in a full report by member account.  The information will be provided to the Credit Union for submission of a bond claim, notification of the National Credit Union Administration (NCUA), FBI and other law enforcement.  Again no loss has been identified to member accounts or the credit union.

(Dkt. No. 36: Hans Aff. Ex. 31: 11/17/11 CLA Audit Report at 2; <u>see</u> Dkt. No. 37: Balko Rule 56.1

Counter-Stmt. ¶¶ 182-84.)

**<u>December 21, 2011 CLA Audit Report</u>**

> CLA issued its second summary status report approximately one month later on

December 21, 2011, reporting the following findings:

> [T]he scope of this [unauthorized] activity has been traced as far back as 1999 and terminated . . . for all intensive purposes as of September 9, 2011 the date that Oksana Khan, (former employee, MSR Carteret and South Bound Brook branches) was terminated for cause.
>
> The investigation of transactions and activities to date indicates that Ms. Kahn . . . personally performed the significant [] number of alleged unauthorized transactions on these accounts. . . . In some cases alleged member signatures do not appear to match member signature cards.  While we are not handwriting experts these signatures often appear to be forged in the handwriting of Oksana Khan.
>
> . . . .
>
> It has also been determined that other Credit Union employees have been involved over the years in the alleged suspect transactions from either performing transactions on these accounts without transaction support, involuntarily participated by knowingly allowing Ms. Kahn to use their teller key, authorizing or approving share loans where documents were not signed or properly executed, performing file maintenance transactions (name changes, add/remove join owners, address change), issuing wires and Western Union transfers, accepting a check made out to them personally without proper endorsement (policy violation), opening new accounts without proper or completed signature card documents, or intentionally overlooking alleged unauthorized activity on members accounts.  It appears that most of this activity occurred in the earlier years of this scheme and had not persisted to recent years, except for the willful disregard of overlooking alleged unauthorized activity.
>
> . . . .
>
> As indicated in prior communications, there is no loss identified by any member or to the Credit Union.
>
> In investigating detail transactions to source documents it has been determined that a significant number of original source documents are missing, either destroyed, misplaced, or never retained. . . .

Credit Union internal controls over loan disbursement, wire transfers, teller password security, fraud awareness in large measure have proven ineffective due to the lack of adequate enforcement and monitoring.

Management has notified CUMIS, the bonding company, of a pending loss due to unauthorized activity on member accounts. No claim has yet been filed as no documented loss has been proven. Management has filed an initial SAR report.

Notification of events related to the alleged unauthorized activity have not as yet been reported to the FBI or local law enforcement pending completion of a documentation trail.

(Dkt. No. 36: Hans Aff. Ex. 31: 12/21/11 CLA Audit Report; see Dkt. Nos. 34 & 37: UNFCU & Balko Rule 56.1 Stmts. ¶¶ 115-18; Dkt. No. 37: Balko Rule 56.1 Counter-Stmt. ¶ 182.)

### May 31, 2012 CLA Final Audit Report

On May 31, 2012, CLA issued its final report memorializing the completion of its forensic audit and concluding that they "are not aware of any reported loss or error in members' accounts or in the Credit Union's records." (Dkt. No. 36: Hans Aff. Ex. 20: 5/31/12 CLA Audit Report; see Dkt. Nos. 34 & 37: UNFCU & Balko Rule 56.1 Stmts. ¶ 117.) CLA was unable to confirm the accuracy of twenty of the fifty-four potentially affected accounts, and recommended "that the Supervisory Committee direct management to monitor the activity on the 20 non-response accounts from the forensic procedures verification and seek positive confirmation from these members as to the accuracy of their accounts." (Hans Aff. Ex. 20: 5/31/12 CLA Audit Report; see UNFCU & Balko Rule 56.1 Stmts. ¶ 117.)

### The Baczyk/Drobenko Member Business Loan and Balko's 2012 Reports to the NCUA

On January 26, 2012, Balko presented the UNFCU Board with a $1.6 million member business loan ("MBL") sought by Chairman Walter Drobenko and his wife Larissa Baczyk—Baczyk was the primary borrower and Drobenko was listed as a co-borrower. (Dkt. Nos. 34 & 37: UNFCU & Balko Rule 56.1 Stmts. ¶¶ 38, 44, 81; Dkt. No. 37: Balko Rule 56.1 Counter-

Stmt. ¶ 265.)  Aside from presenting the loan to the Board, Balko did not participate in "any decision making, processing, or communication with respect to the Baczyk/Drobenko loan."  (Balko Rule 56.1 Counter-Stmt. ¶¶ 267-68, 275-76.)

Prior to January 26, 2012, UNFCU's Loan Review personnel considered using interest rates ranging from 5.25% to 6.5% for the loan and prepared multiple draft commitment letters.  (UNFCU & Balko Rule 56.1 Stmts. ¶¶ 50-51, 54; Balko Rule 56.1 Counter-Stmt. ¶¶ 271-72, 274, 284.)  During her January 26, 2012 Board presentation, Balko stated that the MBL would be issued with a six percent interest rate, based on the commitment letter contained in the loan file at that time.  (UNFCU & Balko Rule 56.1 Stmts. ¶¶ 48, 52; Balko Rule 56.1 Counter-Stmt. ¶¶ 277-78, 281, 283, 287-88, 295; Dkt. No. 36: Hans Aff. Ex. 1: Balko Dep. at 98, 111-14; Hans Aff. Ex. 9: 3/10/12 BOD Mtg. Mins. at 924-25.)  The MBL closed on March 6, 2012 with a lower 5.25% interest rate, which UNFCU asserts had been approved by the Loan Review Committee on January 11, 2012 prior to Balko's Board presentation, and thus would have been reflected on the commitment letter in the loan file at the time.  (UNFCU & Balko Rule 56.1 Stmts. ¶¶ 49, 64; Balko Rule 56.1 Counter-Stmt. ¶¶ 275-76, 279-80, 282, 289-90.)  Balko claims that the 5.25% commitment letter was issued on February 15, 2012, after her Board presentation, and asserts that she was not informed of the lowered interest rate until a Board meeting on February 16, 2012.  (Balko Rule 56.1 Counter-Stmt. ¶¶ 286-90, 314.)

Also during the January 26, 2012 Board presentation, Balko stated that UNFCU had $2.4 million available for commercial loans—which meant that if it issued the MBL, UNFCU would remain in compliance with NCUA's regulatory threshold of 12.25% of UNFCU's total assets.  (UNFCU & Balko Rule 56.1 Stmts. ¶¶ 37, 43, 46-47, 56, 66; Balko Rule 56.1 Counter-Stmt. ¶¶ 298, 302, 304, 306, 314, 321; Balko Dep. at 98-99, 124-25; Hans Aff. Ex. 9: 3/10/12 BOD Mtg. Mins.

at 924-25.)  Additionally, Balko informed the Board that a loan to the Chairman was permissible under UNFCU's MBL Policy, so long as it was Board approved.  (UNFCU & Balko Rule 56.1 Stmts. ¶¶ 37, 40, 43-44, 46, 71-74; Balko Rule 56.1 Counter-Stmt. ¶¶ 326-28, 330-34.)

Early on February 27, 2012, Balko emailed the Board reporting that "as of Wednesday February 29, 2012, the credit union will exceed its MBL ratio of 12.25%, which in accordance with NCUA regulations, is a violation."  (Hans Aff. Ex. 12: 2/27/12 Balko Email; see UNFCU & Balko Rule 56.1 Stmts. ¶¶ 63, 90.)  Balko further stated that she would "report this situation, to our NCUA[] examiner Ryan Sullivan" later that day.  (Hans Aff. Ex. 12: 2/27/12 Balko Email; see Balko Rule 56.1 Counter-Stmt. ¶¶ 242-43, 309, 311.)

A June 2012 NCUA Examination Report found that UNFCU's violation of the NCUA's 12.25% limit was the result of a large loan that it granted to a former board member.  (UNFCU & Balko Rule 56.1 Stmts. ¶ 65.)

**Balko's Termination**

On March 8, 2012, UNFCU's Supervisory Committee issued a formal letter to Balko providing a "'negative assessment' of her tenure as CEO," focusing specifically on her alleged misconduct in connection with obtaining Board approval for the Drobenko MBL.  (Dkt. Nos. 34 & 37: UNFCU & Balko Rule 56.1 Stmts. ¶¶ 97-98.)  On March 10, 2012, the UNFCU Board held a Special Meeting to investigate Balko's role in the MBL's issuance, and concluded that Balko's January 26, 2012 Board presentation was deliberately misleading.  (UNFCU & Balko Rule 56.1 Stmts. ¶¶ 99-103; Dkt. No. 36: Hans Aff. Ex. 9: 3/10/12 BOD Mtg. Mins.)  When Drobenko inquired during the Special Meeting about the January 11, 2012 5.25% interest rate commitment letter that purportedly was in the loan file when Balko made the Board presentation, the Lending Manager could not find the letter in the file.  (Balko Rule 56.1 Counter-Stmt. ¶¶ 291-92.)  The

Lending Manager left the Special Meeting for approximately fifteen minutes and returned with a 5.25% interest rate commitment letter signed only by the Lending Manager that was originally dated December 29, 2011 but had the date crossed out and replaced by hand with January 11, 2012, and which was not the commitment letter that had been presented and issued to Drobenko.  (Balko Rule 56.1 Counter-Stmt. ¶¶ 292-94.)   Balko was not given an opportunity to respond to any of the allegations of misconduct, in contravention of UNFCU's policies and procedures.  (Balko Rule 56.1 Counter-Stmt. ¶¶ 257-58, 261.)

A majority of the Board voted to terminate Balko's employment on March 10, 2012. (UNFCU & Balko Rule 56.1 Stmts. ¶¶ 32, 104.)  Balko asserts that she was terminated because she reported information to the NCUA regarding UNFCU's possible violations, while UNFCU asserts that Balko was terminated for conduct related to the Drobenko MBL.  (UNFCU & Balko Rule 56.1 Stmts. ¶¶ 32, 104; Balko Rule 56.1 Counter-Stmt. ¶¶ 212-14, 226, 229, 244-64, 341.)

## ANALYSIS

### I.   SUMMARY JUDGMENT STANDARDS

#### A.   The General Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); Humphreys v. Cablevision Sys. Corp., No. 12-4431-cv, --- F. App'x ----, 2014 WL 185010 at *1 (2d Cir. Jan. 17, 2014); Connolly v. Calvanese, 515 F. App'x 62, 62 (2d Cir. 2013); Lang v. Ret. Living Publ'g Co., 949 F.2d 576, 580 (2d Cir. 1991).

The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment.  See, e.g., Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 1608 (1970); Alzawahra v. Albany Med. Ctr., No. 12-4517, --- F. App'x ----, 2013 WL 6284286 at *1 (2d Cir. Dec. 5, 2013); Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 36 (2d Cir. 1994); Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994).  The movant may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the non-moving party's case on an issue on which the non-movant has the burden of proof.  See, e.g., Celotex Corp. v. Catrett, 477 U.S. at 323, 106 S. Ct. at 2552-53; Dolan v. Cassella, 543 F. App'x 90, 90 (2d Cir. 2013).

To defeat a summary judgment motion, the non-moving party "'must do more than simply show that there is some metaphysical doubt as to the material facts.'"  Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776 (2007) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986)).  Instead, the non-moving party must "cit[e] to particular parts of materials in the record" to show that "a fact . . . is genuinely disputed." Fed. R. Civ. P. 56(c)(1); see, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587, 106 S. Ct. at 1356; Alzawahra v. Albany Med. Ctr., 2013 WL 6284286 at *1; Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (at summary judgment, "[t]he time has come . . . 'to put up or shut up'"), cert. denied, 540 U.S. 811, 124 S. Ct. 53 (2003).

In evaluating the record to determine whether there is a genuine issue as to any material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 255, 106 S. Ct. at 2513.[4/]

---

[4/]     See also, e.g., Crown Castle NG E. Inc. v. Town of Greenburgh, N.Y., No. 13-2921-cv, ---
(continued...)

The Court draws all inferences in favor of the non-moving party only after determining that such inferences are reasonable, considering all the evidence presented.  See, e.g., Apex Oil Co. v. DiMauro, 822 F.2d 246, 252 (2d Cir.), cert. denied, 484 U.S. 977, 108 S. Ct. 489 (1987).  "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper."  Chambers v. TRM Copy Ctrs. Corp., 43 F.3d at 37.

In considering a motion for summary judgment, the Court is not to resolve contested issues of fact, but rather is to determine whether there exists any disputed issue of material fact.  See, e.g., Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987); Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986), cert. denied, 480 U.S. 932, 107 S. Ct. 1570 (1987).  To evaluate a fact's materiality, the substantive law determines which facts are critical and which facts are irrelevant.  See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. at 248, 106 S. Ct. at 2510.  While "disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment[,] [f]actual disputes that are irrelevant or unnecessary will not be counted."  Id. at 248, 106 S. Ct. at 2510 (citations omitted); see also, e.g., Knight v. U.S. Fire Ins. Co., 804 F.2d at 11-12.

## B.    Additional Summary Judgment Standards in Employment Retaliation Cases

When a case turns on the intent of one party, as retaliation claims often do, a "trial court must be cautious about granting summary judgment."  Gallo v. Prudential Residential Servs.,

---

(...continued)
F. App'x ----, 2014 WL 185012 at *2 (2d Cir. Jan. 17, 2014); Alzawahra v. Albany Med. Ctr., 2013 WL 6284286 at *1; Feingold v. New York, 366 F.3d 138, 148 (2d Cir. 2004); Chambers v. TRM Copy Ctrs. Corp., 43 F.3d at 36; Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d at 1223.

Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).[5/]  Because the employer rarely leaves direct evidence of its retaliatory intent, the Court must carefully comb the available evidence in search of circumstantial proof to undercut the employer's explanations for its actions. E.g., Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d at 1224; Broich v. Inc. Vill. of Southampton, 462 F. App'x at 43; Thompson v. Morris Heights Health Ctr., 2012 WL 1145964 at *4.  "[S]ummary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial.  There must either be a lack of evidence in support of the plaintiff's position or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." Danzer v. Norden Sys., Inc., 151 F.3d 50, 54 (2d Cir. 1998) (citations & fn. omitted).  Nonetheless, when an employer provides convincing evidence to explain its conduct and the plaintiff's argument consists of purely conclusory allegations of retaliation, the Court may conclude that no material issue of fact exists and it may grant summary judgment to the employer. E.g., Douglass v. Rochester City Sch. Dist., 522 F. App'x 5, 7 (2d Cir. 2013); Karlen v. Landon, 503 F. App'x 44, 48 (2d Cir. 2012); Budde v. H&K Distrib. Co., No. 99-9449, 216 F.3d 1071 (table), 2000 WL 900204 at *1 (2d Cir. June 29, 2000); Stern v. Trs. of Columbia Univ., 131 F.3d 305, 312 (2d Cir. 1997); Meloff v. N.Y. Life Ins. Co., 51 F.3d 372, 375 (2d Cir. 1995); Thompson v. Morris Heights Health Ctr., 2012 WL 1145964 at *4.

---

[5/]      Accord, e.g., Kwan v. Andalex Grp. LLC, 737 F.3d 834, 843 (2d Cir. 2013); Broich v. Inc. Vill. of Southampton, 462 F. App'x 39, 43 (2d Cir.), cert. denied, 133 S. Ct. 527 (2012); Feingold v. New York, 366 F.3d 138, 149 (2d Cir. 2004); Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998) ("[I]n an employment discrimination case when, as here, the employer's intent is at issue, the trial court must be especially cautious about granting summary judgment."); McLee v. Chrysler Corp., 109 F.3d 130, 135 (2d Cir. 1997) ("[C]aution must be exercised in granting summary judgment where motive is genuinely in issue."); Thompson v. Morris Heights Health Ctr., 09 Civ. 7239, 2012 WL 1145964 at *4 (S.D.N.Y. Apr. 6, 2012); Cardoza v. Healthfirst, Inc., 210 F. Supp. 2d 224, 227 (S.D.N.Y. 1999); see also, e.g., Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 40 (2d Cir. 1994).

In other words, to defeat summary judgment, "the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based" on retaliatory motive.  Stern v. Trs. of Columbia Univ., 131 F.3d at 312; accord, e.g., Kwan v. Andalex Grp. LLC, 737 F.3d at 845-46; Schnabel v. Abramson, 232 F.3d 83, 90-91 (2d Cir. 2000); Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000) ("[T]he question [on summary judgment is] . . . whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination.  To get to the jury, it is not enough to disbelieve the employer; the factfinder must also believe the plaintiff's explanation of intentional discrimination." (quotations & alterations omitted)), cert. denied, 540 U.S. 811, 124 S. Ct. 53 (2003); Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 714 (2d Cir. 1996) (plaintiff must "produce not simply 'some' evidence, but 'sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the employer were false, and that more likely than not [discrimination] was the real reason for the discharge'").[6/]  Indeed, the Second Circuit "went out of [its] way to remind district courts that the 'impression that summary judgment is unavailable to defendants in discrimination [and retaliation] cases is unsupportable.'"  Weinstock v. Columbia Univ., 224 F.3d at 41; see, e.g., Thompson v. Morris Heights Health Ctr., 2012 WL 1145964 at *4.

## II.    LEGAL STANDARDS GOVERNING FCUA RETALIATION CASES

The FCUA's whistleblower provision prohibits credit unions from retaliating against employees:

No insured credit union may discharge or otherwise discriminate against any employee with respect to compensation, terms, conditions, or privileges of

---

[6/]    See, e.g., Budde v. H&K Distrib. Co., 2000 WL 900204 at *1; Scaria v. Rubin, 94 Civ. 3333, 1996 WL 389250 at *5 (S.D.N.Y. July 11, 1996) (Peck, M.J.), aff'd, 117 F.3d 652 (2d Cir. 1997); see also cases cited on page 23 below.

> employment because the employee . . . provided information to the Board or the Attorney General regarding any possible violation of any law or regulation by the credit union or any director, officer, or employee of the credit union.

12 U.S.C. § 1790b(a)(1).  This protection extends to all credit union employees unless the employee "deliberately causes or participates in the alleged violation of law or regulation, or [] knowingly or recklessly provides substantially false information to such an agency or the Attorney General."  12 U.S.C. § 1790b(d)(1)-(2).

Since the case law interpreting section 1790b itself is extremely sparse, courts have looked to case law construing comparably-phrased anti-retaliation provisions in other federal whistleblower and employment discrimination statutes.  See, e.g., McNett v. Hardin Cmty. Fed. Credit Union, 118 F. App'x 960, 963 (6th Cir. 2004); Simas v. First Citizens' Fed. Credit Union, 170 F.3d 37, 43-44 (1st Cir. 1999).[7]  Such analogous statutes include Title VII, the Americans with Disabilities Act ("ADA"), the Age Discrimination in Employment Act ("ADEA"), the False Claims Act ("FCA"), the Safety Transportation Assistance Act ("STAA"), the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), and the Sarbanes-Oxley Act ("SOX").  See,

---

[7]      See also, e.g., Ruth v. Shelby Cnty. Fed. Credit Union, No. 09-2795, 2010 WL 4922635 at *11 (W.D. Tenn. Nov. 29, 2010) ("In the absence of the other authority applying the Federal Credit Union Act's whistleblower protections, the courts should turn 'to case law construing comparably-phrased anti-retaliation provisions in other federal employment-discrimination statutes' such as Title VII."); Garrett v. Langley Fed. Credit Union, 121 F. Supp. 2d 887, 897 (E.D. Va. 2000) ("[C]ourts faced with the task of interpreting § 1790b should look to case law construing similarly-phrased anti-retaliation provisions in other federal employment discrimination statutes.  This reliance on comparably-phrased statutes is necessary in analyzing the case at bar because § 1790b contains no explicit burden of proof allocation." (citation omitted)); cf., e.g., Portes v. Wyeth Pharm., Inc., 06 Civ. 2689, 2007 WL 2363356 at *4 n.4 (S.D.N.Y. Aug. 20, 2007) ("Given the relative scarcity of caselaw interpreting SOX, courts also 'look to caselaw applying provisions of other federal whistleblower statutes for guidance.'"); Nat'l Credit Union Admin. Bd. v. Concord Limousine, Inc., 872 F. Supp. 1174, 1177 (E.D.N.Y. 1995).

e.g., McNett v. Hardin Cmty. Fed. Credit Union, 118 F. App'x at 963 n.3; Simas v. First Citizens' Fed. Credit Union, 170 F.3d at 43-44; Garrett v. Langley Fed. Credit Union, 121 F. Supp. 2d at 897.

Because the Second Circuit has not directly spoken about the requirements for claims brought under 12 U.S.C. § 1790b, the Court relies on this Circuit's interpretation of comparably-phrased anti-retaliation statutes in construing and applying the FCUA to Balko's claim.

### A.    Elements of a Prima Facie FCUA Retaliation Claim

To state a prima facie retaliation claim under 12 U.S.C. § 1790b, "a plaintiff must show that (1) she participated in a protected activity known to the defendant, (2) she suffered an adverse employment action, and (3) there was a causal connection between the protected activity and the adverse action." Andersen v. Rochester City Sch. Dist., 481 F. App'x 628, 631 (2d Cir. 2012) (Title VII retaliation), cert. denied, 133 S. Ct. 836 (2013)[8]; accord, e.g., Schroeder v. Greater

---

[8]    See, e.g., Giudice v. Red Robin Int'l, Inc., No. 13-1190-CV, --- F. App'x ----, 2014 WL 552668 at *1 (2d Cir. Feb. 13, 2014); Fosco v. City Univ. of N.Y., 513 F. App'x 4, 5 (2d Cir. 2013); Summa v. Hofstra Univ., 708 F.3d 115, 125 (2d Cir. 2013); Drumm v. SUNY Geneseo Coll., 486 F. App'x 912, 914 (2d Cir. 2012); Kessler v. Westchester Cnty. Dep't of Soc. Servs., 461 F.3d 199, 205-06 (2d Cir. 2006); Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002); Weixel v. Bd. of Educ., 287 F.3d 138, 148-49 (2d Cir. 2002); Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 223 (2d Cir. 2001); Gordon v. N.Y.C. Bd. of Educ., 232 F.3d 111, 116 (2d Cir. 2000); see also, e.g., 82 John Bourdeau & Barbara J. Van Arsdale, Am. Jur. 2d Wrongful Discharge § 113 (2d ed. 2014) ("Under the antiretaliation or whistleblower provisions of federal statutes, an employee must make a three-part prima facie showing that (1) the employee engaged in the protected activity, such as filing a complaint or reporting information to the government; (2) the employer subjected the employee to some materially adverse employment action; and (3) a causal connection existed between the protected activity and the adverse action.").

Although an employer's knowledge of a plaintiff's protected activity may be listed separately as a fourth element of a retaliation claim, the Second Circuit has noted that the employer's knowledge is subsumed in the causal connection requirement, since "it is implicit that before certain conduct can be 'a contributing factor' to an employer's decision, the employer must at least suspect that the employee has engaged in that conduct." Bechtel v. Admin. Review Bd., U.S. Dep't of Labor, 710 F.3d 443, 447 n.5 (2d Cir. 2013); see also, e.g., Melchi v.
(continued...)

New Orleans Fed. Credit Union, 664 F.3d 1016, 1021 (5th Cir. 2011) (applying Title VII standard to § 1790b retaliation claim); McNett v. Hardin Cmty. Fed. Credit Union, 118 F. App'x 960, 964 (6th Cir. 2004) (§ 1790b retaliation claim); Simas v. First Citizens' Fed. Credit Union, 170 F.3d 37, 44 (1st Cir. 1999) (same); Garrett v. Langley Fed. Credit Union, 121 F. Supp. 2d 887, 897-98 (E.D. Va. 2000) (same).

B.    **Burden of Proof for a FCUA Retaliation Claim**

In connection with claims brought under comparably-phrased federal anti-retaliation statutes, the Second Circuit applies the burden-shifting analysis established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824 (1973).[9/] See, e.g., Kwan v. Andalex Grp. LLC, 737 F.3d 834, 843 (2d Cir. 2013); Brown v. City of Syracuse, 673 F.3d 141, 150 (2d Cir. 2012); Desir v. City of N.Y., 453 F. App'x 30, 33 (2d Cir. 2011).

---

[8/]    (...continued)
Burns Int'l Sec. Servs., Inc., 597 F. Supp. 575, 582 (E.D. Mich. 1984) ("By stating the elements of plaintiff's prima facie case in four parts, these courts have seemingly stiffened plaintiff's burden by requiring a showing that the employer knew of the protected activity and reacted with a retaliatory motive.  This apparent difference, however, is somewhat illusory and misleading.  In adopting the three-part test of a plaintiff's prima facie case, the majority of courts have recognized that in a retaliation case, the element of causation must be shown. . . . With this in mind, it becomes clear that the additional element set forth by some courts i.e. that the employer knew of the protected activity, is simply a factor to consider in determining the principal question of causation.  Thus the Court believes the three part prima facie case more clearly and precisely establishes a plaintiff's initial burden in a claim brought under the Whistleblowers' Act.").  In any event, the parties do not dispute UNFCU's knowledge of Balko's allegedly protected activity.  (See pages 45-54 below.)

[9/]    Courts outside this Circuit have analyzed FCUA retaliation claims using the McDonnell Douglas analysis.  E.g., McNett v. Hardin Cmty. Fed. Credit Union, 118 F. App'x 960, 965 (6th Cir. 2004); Simas v. First Citizens' Fed. Credit Union, 170 F.3d 37, 44 (1st Cir. 1999); Kittel v. C-Plant Fed. Credit Union, No. 08-CV-00114, 2010 WL 1949675 at *2 (W.D. Ky. May 13, 2010); Fain v. Transmission Builders Fed. Credit Union, No. 04-CV-0354, 2005 WL 2126778 at *3 (S.D. Ind. Sept. 1, 2005).

Under the familiar McDonnell Douglas burden-shifting analysis, the plaintiff has the burden at the outset of "proving by the preponderance of the evidence a prima facie case" of retaliation. Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53, 101 S. Ct. 1089, 1093 (1981); see, e.g., Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142, 120 S. Ct. 2097, 2106 (2000); McDonnell Douglas Corp. v. Green, 411 U.S. at 802, 93 S. Ct. at 1824.[10] "The burden of establishing a prima facie case is not onerous, and has been frequently described as minimal." Scaria v. Rubin, 117 F.3d 652, 654 (2d Cir. 1997); accord, e.g., St. Mary's Honor Ctr. v. Hicks, 509 U.S. at 506, 113 S. Ct. at 2746-47.[11] Establishment of a prima facie case "'in effect creates a presumption that the employer unlawfully [retaliated] against the employee.'" St. Mary's Honor Ctr.

---

[10] See also, e.g., Raytheon Co. v. Hernandez, 540 U.S. 44, 50 n.3, 124 S. Ct. 513, 517 n.3 (2003); O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 310, 116 S. Ct. 1307, 1309 (1996); St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507, 113 S. Ct. 2742, 2746-47 (1993); Kwan v. Andalex Grp. LLC, 737 F.3d at 844; Ruszkowski v. Kaleida Health Sys., 422 F. App'x 58, 60 (2d Cir. 2011); United States v. Brennan, 650 F.3d 65, 93 (2d Cir. 2011); Leibowitz v. Cornell Univ., 584 F.3d at 498; Dorfman v. Doar Commc'ns, Inc., 314 F. App'x 389, 390 (2d Cir. 2009); DeSalvo v. Volhard, 312 F. App'x 394, 396 (2d Cir.), cert. denied, 130 S. Ct. 70 (2009); Fall v. N.Y.S. United Teachers, 289 F. App'x at 420-21; Nader v. ABC Television, Inc., 150 F. App'x 54, 55 (2d Cir. 2005); Mandell v. Cnty. of Suffolk, 316 F.3d 368, 377-78 (2d Cir. 2003); Mario v. P&C Food Mkts., Inc., 313 F.3d 758, 767 (2d Cir. 2002); Collins v. N.Y.C. Transit Auth., 305 F.3d 113, 118 (2d Cir. 2002); Schnabel v. Abramson, 232 F.3d 83, 87 (2d Cir. 2000); Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994).

[11] See also, e.g., Kwan v. Andalex Grp. LLC, 737 F.3d at 844; Broich v. Inc. Vill. of Southampton, 462 F. App'x 39, 43 (2d Cir.), cert. denied, 133 S. Ct. 527 (2012); Mathirampuzha v. Potter, 548 F.3d 70, 78 (2d Cir. 2008); Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000), cert. denied, 540 U.S. 811, 124 S. Ct. 53 (2003); Austin v. Ford Models, Inc., 149 F.3d 148, 152 (2d Cir. 1998); Raskin v. Wyatt Co., 125 F.3d 55, 64 (2d Cir. 1997); Chambers v. TRM Copy Ctrs. Corp., 43 F.3d at 32; Fisher v. Vassar Coll., 114 F.3d 1332, 1335 (2d Cir. 1997), cert. denied, 522 U.S. 1075, 118 S. Ct. 851 (1998); Shepherd v. BCBG Max Azria Grp., Inc., 11 Civ. 7634, 2012 WL 4832883 at *15 (S.D.N.Y. Oct. 11, 2012) (Peck, M.J.) (& cases cited therein), report & rec. adopted, 2012 WL 6150854 (S.D.N.Y. Dec. 10, 2012).

v. Hicks, 509 U.S. at 506, 113 S. Ct. at 2747 (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. at 254, 101 S. Ct. at 1094).[12/]

Once a plaintiff claiming whistleblower retaliation establishes a prima facie case, the burden shifts to the defendant to rebut the presumption of unlawful retaliation by articulating a legitimate, non-retaliatory reason for its employment decision. E.g., Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. at 142-43, 120 S. Ct. at 2106; McDonnell Douglas Corp. v. Green, 411 U.S. at 802, 93 S. Ct. at 1824.[13/] The burden on the defendant at this phase is one of production rather than persuasion. E.g., Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. at 142, 120 S. Ct. at 2106.[14/]

---

[12/]   See also, e.g., Crawford v. Dep't of Investigation, 324 F. App'x 139, 141 (2d Cir. 2009); Smith v. New Venture Gear, Inc., 319 F. App'x 52, 54 (2d Cir. 2009); Joseph v. Leavitt, 465 F.3d 87, 90 (2d Cir. 2006), cert. denied, 549 U.S. 1282, 127 S. Ct. 1855 (2007); Mandell v. Cnty. of Suffolk, 316 F.3d at 380; Mario v. P&C Food Mkts., Inc., 313 F.3d at 767; Scaria v. Rubin, 117 F.3d at 654.

[13/]   See also, e.g., Raytheon Co. v. Hernandez, 540 U.S. at 50 n.3, 124 S. Ct. at 517 n.3; O'Connor v. Consol. Coin Caterers Corp., 517 U.S. at 310, 116 S. Ct. at 1309; St. Mary's Honor Ctr. v. Hicks, 509 U.S. at 506-07, 113 S. Ct. at 2747; Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. at 253-54, 101 S. Ct. at 1093-94; Kwan v. Andalex Grp. LLC, 737 F.3d at 845; Desir v. City of N.Y., 453 F. App'x at 33-34; United States v. Brennan, 650 F.3d at 93; Leibowitz v. Cornell Univ., 584 F.3d at 498-99; Dorfman v. Doar Commc'ns, Inc., 314 F. App'x at 390; DeSalvo v. Volhard, 312 F. App'x at 396; Fall v. N.Y.S. United Teachers, 289 F. App'x at 421; Nader v. ABC Television, Inc., 150 F. App'x at 55; Feingold v. New York, 366 F.3d 138, 152 (2d Cir. 2004); Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003); Mandell v. Cnty. of Suffolk, 316 F.3d at 380; Mario v. P&C Food Mkts., Inc., 313 F.3d at 767; Schnabel v. Abramson, 232 F.3d at 88; Weinstock v. Columbia Univ., 224 F.3d at 42; Stern v. Trs. of Columbia Univ., 131 F.3d 305, 312 (2d Cir. 1997); Scaria v. Rubin, 117 F.3d at 654; Chambers v. TRM Copy Ctrs. Corp., 43 F.3d at 38.

[14/]   See also, e.g., St. Mary's Honor Ctr. v. Hicks, 509 U.S. at 507, 113 S. Ct. at 2747; Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. at 257, 101 S. Ct. at 1096; Terry v. Ashcroft, 336 F.3d at 144 n.17; Scaria v. Rubin, 117 F.3d at 654.

"Although intermediate evidentiary burdens shift back and forth under [the McDonnell Douglas] framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally [retaliated] against the plaintiff remains at all times with the plaintiff.'" Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. at 143, 120 S. Ct. at 2106.

If the defendant articulates a non-retaliatory reason, the McDonnell Douglas burden-shifting framework drops out of the picture, and the plaintiff must show that the defendant's purported reason is a pretext and that the adverse employment action would not have occurred "but for" the defendant's retaliatory intent.  E.g., Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2533 (2013).[15/]  "However, 'but-for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive."  Kwan v. Andalex Grp. LLC, 737 F.3d at 846.[16/]  "Moreover, although the presumption of [unlawful retaliation] 'drops out of the picture' once the defendant meets its burden of production, . . . the trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether the

---

[15/]    Accord, e.g., Giudice v. Red Robin Int'l, Inc., No. 13-1190-CV, --- F. App'x ----, 2014 WL 552668 at *2 n.1 (2d Cir. Feb. 13, 2014); Goins v. Bridgeport Hosp., No. 13-1465-cv, --- F. App'x ----, 2014 WL 552676 at *3 & n.3 (2d Cir. Feb. 13, 2014); Wolf v. Time Warner, Inc., No. 12-4226-cv, --- F. App'x ----, 2013 WL 6670685 at *3 (2d Cir. Dec. 19, 2013); Kwan v. Andalex Grp. LLC, 737 F.3d at 845; Dotson v. City of Syracuse, Nos. 11-5323-cv, 12-4443-cv, --- F. App'x ----, 2013 WL 6183012 at *1 (2d Cir. Nov. 27, 2013); Puglisi v. Town of Hempstead, Dep't of Sanitation, No. 12-3815-cv, --- F. App'x ----, 2013 WL 5663223 at *1 (2d Cir. Oct. 18, 2013).

[16/]    See also, e.g., Kwan v. Andalex Grp. LLC, 737 F.3d at 846 n.5 (A "plaintiff's injury can have multiple 'but-for' causes, each one of which may be sufficient to support liability. Requiring proof that a prohibited consideration was a 'but-for' cause of an adverse action does not equate to a burden to show that such consideration was the 'sole' cause." (citations omitted)); Sass v. MTA Bus Co., No. 10-CV-4079, 2014 WL 585418 at *4 (E.D.N.Y. Feb. 14, 2014); Stoler v. Inst. for Integrative Nutrition, 13 Civ. 1275, 2013 WL 6068598 at *12 (S.D.N.Y. Nov. 18, 2013).

defendant's explanation is pretextual.'" Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. at 143, 120 S. Ct. at 2106 (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. at 255 n.10, 101 S. Ct. at 1095 n.10).[17]

---

[17]     UNFCU argues that Balko is required to show that UNFCU's retaliatory animus was a but-for cause of her termination (Dkt. No. 35: UNFCU Br. at 3; Dkt. No. 41: UNFCU Reply Br. at 6-8), while Balko argues that she need only show that retaliatory motive was a contributing factor to UNFCU's termination decision (Dkt. No. 38: Balko Opp. Br. at 15-17). In the context of Title VII retaliation, the Supreme Court recently held that unless the statute articulates a different causation standard, "retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in" some other statutes. Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. at 2533; see also Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 176, 129 S. Ct. 2343, 2350 (2009) ("The words 'because of' mean 'by reason of: on account of.' Thus, the ordinary meaning of the ADEA's requirement that an employer took adverse action 'because of' age is that age was the 'reason' that the employer decided to act. To establish a disparate-treatment claim under the plain language of the ADEA, therefore, a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision." (citations omitted)). Because the Court finds that Balko has raised material issues of fact sufficient to defeat summary judgment under the more stringent "but-for" standard (see page 53 below), the Court need not decide which standard applies to § 1790b claims. See Kwan v. Andalex Grp. LLC, 737 F.3d at 846 n.5 ("The determination of whether retaliation was a 'but-for' cause, rather than just a motivating factor, is particularly poorly suited to disposition by summary judgment, because it requires weighing of the disputed facts, rather than a determination that there is no genuine dispute as to any material fact. A jury should eventually determine whether the plaintiff has proved by a preponderance of the evidence that she did in fact complain about discrimination and that she would not have been terminated if she had not complained about discrimination."); Sass v. MTA Bus Co., 2014 WL 585418 at *4 ("[A]ssuming without deciding that the 'but-for' standard announced in Nassar should be applied to assess Defendant's Rule 50 motion, the Court does not find that 'the evidence in favor of the movant is so overwhelming that reasonable and fair minded persons could not arrive at a verdict against it.' The determination of whether Plaintiff's protected activity was the 'but for' cause of his termination ultimately will be based on a credibility assessment of the witnesses at trial, a task best left to the jury." (citation & fn. omitted)); see also, e.g., Travers v. Flight Servs. & Sys., Inc., 737 F.3d 144, 147 n.1 (1st Cir. 2013); Schroeder v. Greater New Orleans Fed. Credit Union, 664 F.3d 1016, 1021 n.4 (5th Cir. 2011); Tse v. N.Y. Univ., 10 Civ. 7207, 2013 WL 5288848 at *18 n.18 (S.D.N.Y. Sept. 19, 2013); Najjar v. Mirecki, 11 Civ. 5138, 2013 WL 3306777 at *7 n.5 (S.D.N.Y. July 2, 2013).

The Supreme Court in 2000 clarified the standard at this stage of the <u>McDonnell</u> <u>Douglas</u> analysis in the context of Title VII's anti-discrimination statute:

> [I]n <u>St. Mary's Honor Center</u> . . . . we held that the factfinder's rejection of the employer's legitimate, nondiscriminatory reason for its action does not <u>compel</u> judgment for the plaintiff. The ultimate question is whether the employer intentionally discriminated, and proof that "the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason . . . is correct." In other words, "[i]t is not enough . . . to <u>dis</u>believe the employer; the factfinder must <u>believe</u> the plaintiff's explanation of intentional discrimination."
>
> In reaching this conclusion, however, we reasoned that it is <u>permissible</u> for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation. . . .
>
> Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive. In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as "affirmative evidence of guilt." Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision. Thus, <u>a plaintiff's prima facie case,</u> <u>combined with sufficient evidence to find that the employer's asserted justification</u> <u>is false, may permit the trier of fact to conclude that the employer unlawfully</u> <u>discriminated</u>.
>
> <u>This is not to say that such a showing by the plaintiff will always be adequate</u> <u>to sustain a jury's finding of liability</u>. Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred. To hold otherwise would be effectively to insulate an entire category of employment discrimination cases from review under Rule 50 [or Rule 56], and we have reiterated that trial courts should not "'treat discrimination differently from other ultimate questions of fact.'"

> Whether judgment as a matter of law [or summary judgment] is appropriate in any particular case will depend on a number of factors.  Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law.

Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. at 146-49, 120 S. Ct. at 2108-09 (emphasis added & citations omitted); see, e.g., Kwan v. Andalex Grp. LLC, 737 F.3d at 846 ("A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action.  From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason.").

After Reeves, the Second Circuit has made clear that merely proving a prima facie case and disproving the employer's explanation for its conduct at the third step of the McDonnell Douglas analysis will not preclude summary judgment in all cases; rather, a case-by-case analysis is necessary:

> In examining the impact of Reeves on our precedents, we conclude that Reeves prevents courts from imposing a per se rule requiring in all instances that a [Title VII] claimant offer more than a prima facie case and evidence of pretext. . . . But the converse is not true; following Reeves, we decline to hold that no [Title VII] defendant may succeed on a summary judgment motion so long as the plaintiff has established a prima facie case and presented evidence of pretext.  Rather, we hold that the Supreme Court's decision in Reeves clearly mandates a case-by-case approach, with a court examining the entire record to determine whether the plaintiff could satisfy his "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff."

Schnabel v. Abramson, 232 F.3d at 90 (emphasis added).[18]

---

[18]    See also, e.g., Braun v. Securitas Sec. Servs. USA, Inc., 372 F. App'x 113, 114 (2d Cir. 2010); Butts v. N.Y.C. Dep't of Hous. Pres. & Dev., 307 F. App'x 596, 599 (2d Cir. 2009); Cross v. N.Y.C. Transit Auth., 417 F.3d 241, 248 (2d Cir. 2005); Feingold v. New York, 366 F.3d at 152; Roge v. NYP Holdings, Inc., 257 F.3d 164, 167-68 (2d Cir. 2001); Abdu-
(continued...)

### III.   UNFCU'S SUMMARY JUDGMENT MOTION SHOULD BE DENIED

UNFCU argues that Balko's evidence fails to establish that she engaged in protected activity (first element) or that she was terminated in retaliation for participating in protected activity (third element).  (Dkt. No. 35: UNFCU Br. at 4-23; Dkt. No. 41: UNFCU Reply Br. at 1-13.)[19/]

### A.   Balko Engaged in Protected Activity

UNFCU argues that Balko fails to satisfy the protected activity element because: (1) she provided information to NCUA regional examiners, not the NCUA "Board" as required by the statute; (2) her NCUA reports "did not relate to potential violations of law within the meaning of Section 1790b"; and (3) she is not entitled to FCUA whistleblower protection because reporting to the NCUA was "within the normal scope of her fiduciary responsibilities."  (Dkt. No. 35: UNFCU Br. at 4-10; Dkt. No. 41: UNFCU Reply Br. at 1-6.)  The Court considers each argument in turn.

---

[18/]   (...continued)
Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 469-70 (2d Cir.), cert. denied, 534 U.S. 993, 122 S. Ct. 460 (2001); James v. N.Y. Racing Ass'n, 233 F.3d 149, 156-57 (2d Cir. 2000); Weinstock v. Columbia Univ., 224 F.3d at 42 ("In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination."); Aksamit v. 772 Park Ave. Corp., 00 Civ. 5520, 2003 WL 22283813 at *6 (S.D.N.Y. Oct. 2, 2003) ("[A] plaintiff's establishment of a prima facie case and rebuttal of a nondiscriminatory reason for the adverse action do not save the plaintiff from summary judgment when there is insufficient evidence of discrimination."), aff'd, 128 F. App'x 204 (2d Cir. 2005); Weiser v. Forest Pharm., Inc., 99 Civ. 1809, 2001 WL 293951 at *7-8 (S.D.N.Y. Mar. 26, 2001); Tanay v. Saint Barnabas Hosp., 99 Civ. 9215, 2001 WL 262695 at *4 (S.D.N.Y. Mar. 15, 2001); Connell v. Consol. Edison Co., 109 F. Supp. 2d 202, 207-08 (S.D.N.Y. 2000) (Chin, D.J.) ("The key is whether there is sufficient evidence in the record – whether it consists of just the prima facie case and proof of pretext alone or those items together with additional evidence – to support an inference of discrimination.").

[19/]   The parties do not dispute that Balko suffered an adverse employment action (second element) when she was terminated.  (See Dkt. No. 38: Balko Opp. Br. at 1.)

1.      **Balko Provided Information "to the [NCUA] Board" Within the Meaning of 12 U.S.C. § 1790b**

FCUA whistleblower protection extends to credit union employees who provide information regarding potential violations "to the [NCUA] Board or the Attorney General."  12 U.S.C. § 1790b(a)(1).  According to the FCUA, "the term 'Board' means the National Credit Union Administration Board," which "consist[s] of three members, who are broadly representative of the public interest, appointed by the President, by and with the advice and consent of the Senate."  12 U.S.C. §§ 1752(4), 1752a(b)(1); see 12 C.F.R. §§ 700.2, 790.2(b)(1).  The Board designates NCUA examiners who are empowered to act on the Board's behalf in supervising credit unions.  See 12 U.S.C. §§ 1756, 1766(d), 1784(a)-(b); 12 C.F.R. § 790.2(b)(5), (c)(1)(ii), (c)(2).

It is undisputed that Balko provided information to NCUA examiners in 2006 (Examiner Zanelloti), 2009 (Examiners McDonough and Kanter), 2011 and 2012 (Examiner Sullivan).  (See pages 3-4, 7, 12 above.)  It is likewise undisputed that Balko did not communicate directly with any of the three NCUA Board members appointed by the President.  (See Dkt. No. 38: Balko Opp. Br. at 2.)  UNFCU argues that Balko's communications with NCUA examiners do not constitute protected activity because the statute explicitly requires reports to be made "to the Board or the Attorney General."  12 U.S.C. § 1790b(a)(1).  (See Dkt. No. 35: UNFCU Br. at 4-8; Dkt. No. 41: UNFCU Reply Br. at 1-6.)  Whether Balko's reports to NCUA examiners constitute protected activity covered by the FCUA is a question of statutory interpretation.

a.      **Legal Standards Governing Statutory Interpretation**

"'Statutory interpretation always begins with the plain language of the statute,' which [the court] consider[s] in 'the specific context in which that language is used, and the broader context of the statute as a whole.'"  In re Ames Dep't Stores, Inc., 582 F.3d 422, 427 (2d Cir. 2009) (citations

omitted), cert. denied, 559 U.S. 962, 130 S. Ct. 1527 (2010).[20] "'To ascertain Congress's intent, we begin with the statutory text because if its language is unambiguous, no further inquiry is necessary.'"  Clark v. Astrue, 602 F.3d 140, 147 (2d Cir. 2010).[21]

      "At the same time, we must interpret [a] specific provision in a way that renders it consistent with the tenor and structure of the whole act or statutory scheme of which it is a part.  We give effect, if possible, to every clause and word of a statute."  Bechtel v. Competitive Techs., Inc., 448 F.3d 469, 471 (2d Cir. 2006) (quotations & citations omitted); accord, e.g., In re Barnet, 737 F.3d at 250 ("A properly limited contextual analysis of statutory language is encompassed within the ambit of a textual analysis."); United States v. Vargas-Cordon, 733 F.3d 366, 381 (2d Cir. 2013) ("'[P]lain meaning can best be understood by looking to the statutory scheme as a whole and placing the particular provision within the context of that statute.'").[22]

---

[20]    See, e.g., United States v. Robinson, 702 F.3d 22, 31 (2d Cir. 2012) ("'The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.'"), cert. denied, 133 S. Ct. 1481 (2013); In re N.Y. Times Co., 577 F.3d 401, 406 (2d Cir. 2009) (in construing statutes, a court should "examine the text of the statute itself, interpreting provisions in light of their ordinary meaning and their contextual setting").

[21]    See also, e.g., In re Barnet, 737 F.3d 238, 246 (2d Cir. 2013) ("Where the statute's language is plain, the sole function of the courts is to enforce it according to its terms." (quotations omitted)); Hedges v. Obama, 724 F.3d 170, 189 (2d Cir. 2013) ("'When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete.'"), petition for cert. filed, 82 U.S.L.W. 3385 (Dec. 16, 2013); Dobrova v. Holder, 607 F.3d 297, 301 (2d Cir. 2010) ("[S]tatutory analysis necessarily begins with the plain meaning of a law's text and, absent ambiguity, will generally end there." (quotations omitted)); United States v. Hasan, 586 F.3d 161, 167 (2d Cir. 2009) ("'Where the statute's language is plain, the sole function of the courts is to enforce it according to its terms.'"), cert. denied, 131 S. Ct. 317 (2010); Life Receivables Trust v. Syndicate 102 at Lloyd's of London, 549 F.3d 210, 216 (2d Cir. 2008) ("'When a statute's language is clear, our only role is to enforce that language "according to its terms."'").

[22]    See, e.g., In re Bernard L. Madoff Inv. Secs. LLC, 654 F.3d 229, 237 (2d Cir. 2011), cert.
                                             (continued...)

### b.    Application to 12 U.S.C. § 1790b(a)(1)

In relevant part, the FCUA whistleblower protection statute provides as follows:

No insured credit union may discharge or otherwise discriminate against any employee with respect to compensation, terms, conditions, or privileges of employment because the employee (or any person acting pursuant to the request of the employee) provided information <u>to the Board</u> or the Attorney General regarding any possible violation of any law or regulation by the credit union or any director, officer, or employee of the credit union.

12 U.S.C. § 1790b(a)(1) (emphasis added).

"In according safeguards against retaliation to credit union employees who report potential irregularities, Congress intended to 'enhance the regulatory enforcement powers of the depository institution regulatory agencies to protect against fraud, waste and insider abuse.'" <u>Simas</u> v. <u>First Citizens' Fed. Credit Union</u>, 170 F.3d 37, 43 (1st Cir. 1999).[23/]

---

[22/]    (...continued)
<u>denied</u>, 133 S. Ct. 24, 25 (2012); <u>United States</u> v. <u>Gayle</u>, 342 F.3d 89, 92-93 (2d Cir. 2003) ("Statutory construction begins with the plain text and, if that text is unambiguous, it usually ends there as well.  Most of the courts that have found 'in any court' to include foreign courts have stressed the unambiguously expansive nature of the phrase. . . . Our textual analysis of what constitutes a predicate offense under § 922(g)(1), however, does not end with the words 'in any court.'  'The text's plain meaning can best be understood by looking to the statutory scheme as a whole and placing the particular provision within the context of that statute.'" (citations omitted)), <u>cert. denied</u>, 544 U.S. 1026, 125 S. Ct. 1968 (2005); <u>Auburn Housing Auth.</u> v. <u>Martinez</u>, 277 F.3d 138, 144 (2d Cir. 2002) ("'Statutory construction . . . is a holistic endeavor.'  The meaning of a particular section in a statute can be understood in context with and by reference to the whole statutory scheme, by appreciating how sections relate to one another.  In other words, the preferred meaning of a statutory provision is one that is consonant with the rest of the statute." (citations omitted)); <u>see also</u> cases cited on page 61 n.46 below.

[23/]    <u>Accord</u>, <u>e.g.</u>, <u>McNett</u> v. <u>Hardin Cmty. Fed. Credit Union</u>, 118 F. App'x 960, 963 (6th Cir. 2004); <u>Ruth</u> v. <u>Shelby Cnty. Fed. Credit Union</u>, No. 09-2795, 2010 WL 4922635 at *11 (W.D. Tenn. Nov. 29, 2010); <u>Stephan</u> v. <u>Greater New Orleans Fed. Credit Union</u>, No. 09-3712, 2009 WL 3837642 at *3 (E.D. La. Nov. 16, 2009) ("[T]he legislation that led to § 1790b(a)(1) arose out of the need to enhance the regulatory powers of the agencies that oversee credit unions."); <u>Wyrick</u> v. <u>TWA Credit Union</u>, 804 F. Supp. 1176, 1179 (W.D. Mo. (continued...)

Courts analyzing FCUA whistleblower claims have providently found that the statute's goal is most directly advanced by requiring whistleblowers to report information to the proper regulatory authority in order to constitute protected activity. See, e.g., Stephan v. Greater New Orleans Fed. Credit Union, 2009 WL 3837642 at *3 (requiring information be brought to regulatory authority "would further [the statute's] goal and allow allegations of fraud and abuse to reach the relevant regulatory body"); Fain v. Transmission Builders Fed. Credit Union, No. 04-CV-0354, 2005 WL 2126778 at *2 (S.D. Ind. Sept. 1, 2005) ("[T]he goals of the statute, to enhance regulatory enforcement and facilitate corrective action, are only furthered when the proper regulatory authority has access to the reports."); Wyrick v. TWA Credit Union, 804 F. Supp. at 1179-80 ("Congress has determined the manner in which they would like to encourage reports of unlawful conduct.  The statute helps to direct such reports to the proper regulatory authorities. . . . [T]he language adopted shows that they intended it to only cover those instances resulting from reports to regulatory authorities.").[24]

---

[23]    (...continued)
1992) ("The goal of the statute clearly is to advance the effectiveness of the regulatory regime.").

[24]    This principle also informs the caselaw declining to recognize internal complaints as protected activity under the FCUA (see page 34 n.26 below), since reports to nonregulatory authorities do not advance the statute's goal of enhancing the effectiveness of the regulatory regime.  See, e.g., Stephan v. Greater New Orleans Fed. Credit Union, 2009 WL 3837642 at *3; Wyrick v. TWA Credit Union, 804 F. Supp. at 1179 ("The purpose of furthering regulatory action to protect against fraud is only indirectly furthered by granting a cause of action for those who report alleged violations to persons other than the Board or the Attorney General. . . . If the information is never brought to their attention, but to a nonregulatory authority instead, the regulatory authority does not have the chance to take corrective or preventive measures as is the goal of the statute.  There is no evidence in the legislative history that one purpose of the legislation was simply to eliminate retaliation against an employee for reporting possible unlawful activity to management, however admirable such a goal may be."); see also, e.g., Gerard Sinzdak, An Analysis of Current Whistleblower
(continued...)

Where, as here, Balko provided information to NCUA examiners designated by the NCUA Board to act on its behalf, "the proper regulatory authority did have an opportunity to take corrective action and further compliance with regulations," Fain v. Transmission Builders Fed. Credit Union, 2005 WL 2126778 at *3, which is precisely what Congress intended to achieve when it enacted the FCUA whistleblower provision.

A number of courts outside this Circuit have indicated that a credit union employee engages in protected activity under § 1790b when she provides information to a regional NCUA examiner, including during an annual NCUA examination of the credit union employer. See, e.g., McNett v. Hardin Cmty. Fed. Credit Union, 118 F. App'x at 962, 964 ("After learning the extent of the due date bumping, [plaintiff]: (1) brought up the jump in September delinquencies to . . . the Credit Union's CEO, while an NCUA examiner was in the room; [and] . . . privately met with [an] NCUA examiner . . . and informed him of the due date bumping. . . . [Plaintiff] and the credit union both agree that [plaintiff's] meeting with [the] NCUA examiner . . . constitutes protected activity, and that [plaintiff] suffered an adverse employment action.  However, they disagree about whether having a conversation with [the Credit Union's CEO] regarding the jump in delinquencies, in front of an NCUA examiner, . . . also constitute[s] protected activity. . . . Although the credit union concedes that [plaintiff] engaged in activity protected by the FCUA when he met with [the] NCUA examiner . . . to discuss the use of the CPC code, the credit union claims that it did not have

---

[24]/     (...continued)
Laws: Defending a More Flexible Approach to Reporting Requirements, 96 Cal. L. Rev. 1633, 1651 (2008) ("[W]histleblowing laws are primarily concerned with protecting society and the public good, not individual employee rights.  Proponents of external reporting requirements stress that unlawful activity must be brought to the public's attention and properly investigated in order to ensure widespread compliance with the law . . . .  If compliance is left to the employer's discretion, . . . too many problems will remain unaddressed and too many law-breakers left undeterred." (fn. omitted)).

knowledge of the meeting and that the protected activity therefore could not have formed the basis for [plaintiff's] termination."); <u>Kittel</u> v. <u>C-Plant Fed. Credit Union</u>, No. 08-CV-00114, 2010 WL 1949675 at *1, *3 (W.D. Ky. May 13, 2010) ("During the examination, [an NCUA regional] examiner . . . met with [plaintiff] to discuss [transactions on] two accounts . . . . There is no dispute that [plaintiff] engaged in protected activity when she told [the NCUA examiner] about the two improper transactions."); <u>Averett</u> v. <u>Chi. Patrolmen's Fed. Credit Union</u>, No. 06 C 4606, 2007 WL 952034 at *2, *6 (N.D. Ill. Mar. 27, 2007) ("On or about November 5, 2005, Plaintiff expressed her concerns about CPFCU senior management's attendance at Supervisory Committee meetings to [an] NCUA examiner . . . . On or about January 25, 2006, Plaintiff spoke with NCUA representatives about her situation at CPFCU, explaining her belief that her interference with senior management's attempts to 'sidestep' NCUA rules and regulations on external auditing firms instigated [defendant's CFO's] harassment. . . .  Defendants' second argument, . . . regarding . . . the relevant statute[']s require[ment of] direct disclosure to a government agency, . . . is factually baseless given that Plaintiff has alleged that she personally disclosed concerns to NCUA personnel on two separate occasions."); <u>Garrett</u> v. <u>Langley Fed. Credit Union</u>, 121 F. Supp. 2d 887, 892, 898, 900 (E.D. Va. 2000) (Plaintiffs "met with [a] National Credit Union Administration ('NCUA') examiner . . . as part of her examination of [defendant]. . . . [Defendant] argues that Plaintiffs cannot prove that they provided information to the Board, through its [regional] examiner . . . , regarding 'any possible violation' of a law or regulation . . . . Plaintiffs are able to demonstrate that they engaged in a protected activity when they reported their concerns to . . . a[n] NCUA examiner.").[25/]

---

[25/]   UNFCU argues that, to the extent these decisions were based on an implication that the regional examiners passed the reported violations on to the Board after hearing them, they are inapposite, since Balko "has submitted no evidence whatsoever suggesting that the Board
(continued...)

UNFCU argues that the statutory requirement that information be reported by credit union employees "to the Board" is unambiguous, and the Court agrees that the text is clear when applied in certain contexts, including in the cases cited by UNFCU.  (See Dkt. No. 35: UNFCU Br. at 7; Dkt. No. 41: UNFCU Reply Br. at 2, 6.)  For example, it is clear that a report made internally to a credit union's management or BOD is not covered,[26] nor is a report made to an entirely different government agency.[27]  (See page 31 n.24 above.)  None of these cases, however, were applying the

---

[25] (...continued)
was actually notified of her alleged reports of possible violations or law 'through its examiners.'" (Dkt. No. 41: UNFCU Reply Br. at 6 n.7.)  Quite to the contrary, there is no indication in any of these cases that the examiner necessarily went on to report the information directly to the NCUA Board.

[26] See Ruth v. Shelby Cnty. Fed. Credit Union, 2010 WL 4922635 at *11 (plaintiff's "formal complaint to the Board of the Credit Union . . . was not protected whistleblowing for purposes of the Federal Credit Union Act because the complaint was not made to the National Board," as distinguished from the internal credit union's board); Stephan v. Greater New Orleans Fed. Credit Union, 2009 WL 3837642 at *2 (plaintiff did not engage in protected activity under the FCUA where "the only people with whom [she] discussed possible violations of the law before her termination were internal [credit union] employees"); Wyrick v. TWA Credit Union, 804 F. Supp. at 1179-80 ("the requirements of the statute have not been met" where plaintiff "reported the alleged unlawful activity only to the [internal] Credit Union Supervisory Board and the Board of Directors"); accord, e.g., Schroeder v. Greater New Orleans Fed. Credit Union, 664 F.3d 1016, 1023 (5th Cir. 2011) (Plaintiff's "internal complaints are not relevant to this § 1790b appeal."); see also, e.g., Faiman v. Ridgewood Sav. Bank, 12 Civ. 5003, 2013 WL 3305785 at *1-2 (S.D.N.Y. May 31, 2013) (plaintiff failed to allege that "she provided any information to a Federal Banking agency, as defined by the statute," 12 U.S.C. § 1831j, where plaintiff "expressed her concerns to the [bank's] assistant branch manager" and "complained . . . to the teller supervisor at the branch"); Schwyzer v. Fiduciary Trust Co. Int'l, 04 Civ. 7975, 2008 WL 3539971 at *1-2, *4 (S.D.N.Y. Aug. 4, 2008) (plaintiff did not "provide[] any information to any of the Federal Banking agencies defined in 12 U.S.C. § 1831j" where he reported suspicious activity only to defendant's corporate counsel).

[27] See Walleri v. Fed. Home Loan Bank of Seattle, 83 F.3d 1575, 1581-82 (9th Cir. 1996) (plaintiff's "report is not within the ambit of the statute," 12 U.S.C. § 1831j, where "the agency to which [plaintiff] made her report, was not a 'federal banking agency' as defined by the statute"); cf. Nowlin v. Resolution Trust Corp., 33 F.3d 498, 502-03 (5th Cir. 1994)
(continued...)

statutory language in the precise situation presented here.  Although the statutory text appears clear on its face, it becomes ambiguous when applied in the particular context of this case, where an external report was made to the correct agency, but the statutory language refers only to the agency Board.  See, e.g., Sequa Corp. & Affiliates v. United States, 350 F. Supp. 2d 447, 452 (S.D.N.Y. 2004) ("Here, while the text of each provision may be relatively straightforward, the application of the statutory text to the present situation is far from unambiguous."), aff'd, 437 F.3d 236 (2d Cir. 2006); Collette v. St. Luke's Roosevelt Hosp., 132 F. Supp. 2d 256, 263 n.6 (S.D.N.Y. 2001) ("A text may be ambiguous in one of two ways: either it is internally inconsistent (an internal ambiguity), or it may appear clear on its face but becomes unclear when read in light of an externality, or applied in a particular context (external ambiguity).  Failure to consider both when reading a statutory text would 'artificially truncate the interpretive process.'"); see also, e.g., United States v. Bonanno Organized Crime Family of La Cosa Nostra, 879 F.2d 20, 22 (2d Cir. 1989) ("The plain-meaning rule, however, is easier stated than applied, since whether . . . the words of a statute are clear is itself not always clear." (quotations omitted)).

This external ambiguity is evidenced in part by the fact that what UNFCU "heralds as the plain and obvious meaning of the relevant statutory text is in fact arrived at by a relatively involved, and selective, process of deduction."  United States v. Bonanno Organized Crime Family of La Cosa Nostra, 879 F.2d at 22.  The statute protects credit union employees who "provided information to the Board or the Attorney General."  12 U.S.C. § 1790b(a)(1).  The "Board" is defined as "the National Credit Union Administration Board," "consist[ing] of three members, who

---

27/      (...continued)
(statute prohibiting "'Federal banking agencies'" from retaliating against whistleblower employees did not apply to unlisted banking agency).

are broadly representative of the public interest, appointed by the President, by and with the advice and consent of the Senate." 12 U.S.C. §§ 1752(4), 1752a(b)(1); see 12 C.F.R. §§ 700.2, 790.2(b)(1). Taken literally, then, § 1790b(a)(1) would seem to require that information be provided to the three Presidentially-appointed Board members to trigger whistleblower protection; UNFCU "does well not to argue that this is what the statute means, for any such reading would raise a host of difficulties." Collette v. St. Luke's Roosevelt Hosp., 132 F. Supp. 2d at 262.  (Dkt. No. 41: UNFCU Reply Br. at 1 n.2; cf., e.g., Dkt. No. 38: Balko Opp. Br. at 9.)  Instead, UNFCU cites the NCUA regulations describing "the procedures for public requests for action by the Board," which state:

> Except as otherwise provided by NCUA regulation, all applications, requests, and submittals for action by the NCUA shall be in writing and addressed to the appropriate office described in § 790.2.  This will usually be one of the Regional Offices.  In instances where the appropriate office cannot be determined, requests should be sent to the Office of Public and Congressional Affairs.

12 C.F.R. §§ 790.1, 790.3.[28/]  On that basis, UNFCU concludes that the whistleblower statute's text

---

[28/]    Section 790.2 describes the agency's structure.  See 12 C.F.R. §§ 790.1, 790.2.  The NCUA is divided among a "Central Office in Alexandria, Virginia" and five regional offices through which the "NCUA's programs are conducted."  12 C.F.R. § 790.2(a), (c).  The regulation describes sixteen offices that operate out of the Central Office including, inter alia: the "Board," consisting of three Presidentially-appointed members responsible for managing the NCUA; the Office of the Examination and Insurance Director, who "formulates standards and procedures for examination and supervision of the community of federally insured credit unions, and reports to the Board on the performance of the examination program"; the Office of the Executive Director, who "reports to the entire NCUA Board," "translates NCUA Board policy decisions into workable programs, delegates responsibility for these programs to appropriate staff members, and coordinates the activities of the senior executive staff" such as the Regional Directors; and the Office of the General Counsel, who "reports to the entire NCUA Board" and "has overall responsibility for all legal matters affecting NCUA." 12 C.F.R. § 790.2(b)(1), (5)-(7).  The regulation lists the locations of the five regional offices which are run by Regional Directors responsible for "manag[ing] NCUA's programs in the Region assigned in accordance with established policies."  12 C.F.R. § 790.2(c)(1)(i)-(ii).  New York is covered by the Region I office, located at 9 Washington Square, Washington Avenue Extension, Albany, NY 12205-5512.  12 C.F.R. § 790.2(c)(1)(i).

"is clear and unambiguous," protecting only those "employees that provide covered information to the NCUA <u>Board</u> at the NCUA's Central Office in Alexandria, Virginia." (UNFCU Br. at 7-8.)[29]

The Court disagrees.   "Whatever else might be said about [UNFCU's] conclusion—that it is arguable or reasonable—it does not follow from the plain language of the statute."  <u>United States</u> v. <u>Bonanno Organized Crime Family of La Cosa Nostra</u>, 879 F.2d at 22. UNFCU's interpretation of the statutory language would frustrate the purpose of the legislation and unjustifiably narrow the whistleblower protection Congress intended.  Rather than encouraging whistleblowing by protecting any employee who provides information to the proper regulatory agency, UNFCU would limit the protection to employees who submit written reports to the three Presidentially-appointed Board members at the NCUA Central Office in Alexandria, Virginia.  This position is not supported by the plain language of the statute and it is inconsistent with the statutory scheme permitting the Board to delegate its authority.[30]  A requirement that the report be made to

---

[29]   <u>See</u> UNFCU Reply Br. at 1 n.2 ("It is not Defendant's position that covered reports are limited to providing information 'directly to one of the NCUA's three Board members.' Reports to the entire NCUA Board at the NCUA's Central Office, as clearly set forth in the FCUA and its implementing regulations, are unambiguously covered by Section 1790b(a)(1).").

[30]   The statutory scheme of the Federal Credit Union Act contemplated that the NCUA Board would delegate its various powers and authorities, such that information could be provided "to the Board" via NCUA personnel designated by the Board.  <u>See</u> 12 U.S.C. § 1766(d) ("The Board is authorized and empowered to execute any and all functions and perform any and all duties vested in it hereby, through such persons as it shall designate or employ; and it may delegate to any person or persons, including any institution operating under the general supervision of the Administration, the performance and discharge of any authority, power, or function vested in it by this chapter."); <u>id.</u> § 1784(a) ("The Board shall appoint examiners who shall have power, on its behalf, to examine any insured credit union . . . . Each examiner shall have power to make a thorough examination of all of the affairs of the credit union and shall make a full and detailed report of the condition of the credit union to the Board."); <u>see also</u>, <u>e.g.</u>, <u>Garrett</u> v. <u>Langley Fed. Credit Union</u>, 121 F. Supp. 2d at 896-97. Indeed, even the NCUA regulations on which UNFCU relies make clear that "requests for
(continued...)

the NCUA in writing has been implicitly rejected by other courts, which have recognized telephonic reports,[31] verbal reports made during formal NCUA examinations,[32] and informal conversations with NCUA officials.[33]  See also, e.g., Kasten v. St.-Gobain Performance Plastics Corp., 131 S. Ct. 1325, 1333-34 (2011) ("Several functional considerations indicate that Congress intended the

---

[30]    (...continued)
action by the Board," 12 C.F.R. § 790.1 (emphasis added), should be made "to the appropriate office" which "will usually be one of the Regional Offices," 12 C.F.R. § 790.3. In other words, "the Board" receives requests for action via its designated officials. Within the FCUA whistleblower statute, 12 U.S.C. § 1790b, the recipient of an employee's complaint is later referred to as the "agency," not specifically the "Board."  12 U.S.C. § 1790b(d)(2).  Further, the statute's use of the phrase "such an agency" was not simply meant to refer to the "Administration" as used in subsection (a)(2), since subsection (a)(2) was added by later amendment.  (See Balko Opp. Br. at 6.)

[31]    See, e.g., Schroeder v. Greater New Orleans Fed. Credit Union, 664 F.3d at 1022, 1024 ("NCUA had no records of any calls from [plaintiff] to the fraud hotline despite its protocol to document such calls . . . .[O]ther evidence supports [plaintiff's] version of events.  For example, phone records show that [plaintiff] called the NCUA seven times in June 2008; two of those calls were long enough to reflect that she may have spoken to someone or left a message.  And several co-workers testified that they were aware that she intended to go to the NCUA in June 2008. . . . Taking the facts in a light most favorable to [plaintiff], we find that the evidence and testimony presented could have allowed a reasonable jury to find that [plaintiff] had engaged in a protected activity . . . .").

[32]    See, e.g., Kittel v. C-Plant Fed. Credit Union, 2010 WL 1949675 at *1, *3 (plaintiff "engaged in protected activity when she told [the NCUA examiner] about the two improper transactions" during a meeting as part of "an examination of [defendant] by the National Credit Union Administration"); Garrett v. Langley Fed. Credit Union, 121 F. Supp. 2d at 892, 900 (plaintiffs "demonstrate[d] that they engaged in a protected activity" where evidence established that plaintiffs "reported their concerns" when they "met with [a] National Credit Union Administration ('NCUA') examiner . . . as part of her examination of" defendant credit union).

[33]    See, e.g., McNett v. Hardin Cmty. Fed. Credit Union, 118 F. App'x at 962, 964 (plaintiff "engaged in activity protected by the FCUA" where he "privately met with [an] NCUA examiner"); Averett v. Chi. Patrolmen's Fed. Credit Union, 2007 WL 952034 at *2, *6 (plaintiff engaged in protected activity when she "spoke with NCUA representatives about her situation" and when she "expressed her concerns" to an NCUA examiner who later visited the credit union "to discuss this issue").

antiretaliation provision to cover oral, as well as written, 'complaint[s].'  First, an interpretation that limited the provision's coverage to written complaints would undermine the Act's basic objectives. . . . To limit the scope of the antiretaliation provision to the filing of written complaints would also take needed flexibility from those charged with the Act's enforcement.  It could prevent Government agencies from using hotlines, interviews, and other oral methods of receiving complaints."); Summa v. Hofstra Univ., 708 F.3d 115, 126-27 (2d Cir. 2013) (district court should have considered oral complaints in determining whether plaintiff engaged in protected activity).

The statute's parallel reference to the Attorney General further underscores UNFCU's untenable position.  See 12 U.S.C. § 1790b(a)(1) (employee must "provide[] information to the Board or the Attorney General" (emphasis added)).  A statutory reference to "the Attorney General" is not usually meant to designate the Presidentially-appointed Attorney General personally, but rather the Department of Justice or an agency under the Attorney General's authority.  E.g., L.D.G. v. Holder, No. 13-1011, --- F.3d ----, 2014 WL 944985 at *2 (7th Cir. Mar. 12, 2014) ("Statutory references to the 'Attorney General' include the EOIR [Executive Office for Immigration Review] . . . , which is a component of the Department of Justice."); Morales-Izquierdo v. Gonzales, 486 F.3d 484, 502 (9th Cir. 2007) (dissent) ("[T]he Attorney General is merely a titular decision-maker, an example of statutory synecdoche, using the head of the Department of Justice to refer to all of its employees.  Countless provisions of the INA [Immigration and Nationality Act] refer to determinations of 'the Attorney General' even when those determinations will actually be made by lower-level employees and even when those determinations must actually be made by immigration judges pursuant to § 240 procedures."); United States v. Wencke, 604 F.2d 607, 612 (9th Cir. 1979) ("The term 'Attorney General' as employed in the [statutory] language should not be taken to exclude United States Attorneys or other Department of Justice personnel . . . ."); Jama v. U.S.

Citizenship & Immigration Servs., 962 F. Supp. 2d 939, 959 (N.D. Ohio 2013) ("[S]tatutory

references to Attorney General are to be read to include . . . [agencies] housed within the Department

of Justice.").[34]

        Accordingly, the Court concludes that a credit union employee who reports violations

to the NCUA Board by reporting to NCUA examiners is participating in protected activity within

the meaning of 12 U.S.C. § 1790b.  Accordingly, UNFCU is not entitled to summary judgment on

this basis.

---

[34]     See also, e.g., Schroeder v. Greater New Orleans Fed. Credit Union, 664 F.3d at 1023 n.6 (declining to decide "whether § 1790b extends its protections to [] whistleblower complaints directed toward the FBI" but indicating that FBI reports could be protected since the FBI is "a federal agency falling under the authority of the Attorney General"); cf., e.g., United States v. Mango, 199 F.3d 85, 91 (2d Cir. 1999) ("'[A]cting through the Chief of Engineers' can be read either to identify the official through whom the Secretary must act or to identify the branch of the Army that will perform the permit-issuing function.  Moreover, in 1970—two years before the enactment of the CWA—Congress passed a statute that authorized the Secretary 'acting through the Chief of Engineers . . . to construct, operate, and maintain . . . contained spoil disposal facilities.'  Four years after enactment of the CWA, Congress authorized the Secretary 'acting through the Chief of Engineers . . . to place on the beaches of such State beach-quality sand.'  Clearly, Congress did not intend the Chief, a lieutenant general, personally to maintain spoil disposal facilities or to spread sand on the beaches.  Thus, the use of 'acting through the Chief of Engineers' in these statutes supports the Secretary's argument that Congress merely intended to assign the permit-issuing function to the Corps.  Although defendants point to other statutes in which Congress used the same phrase but probably intended to require the Chief himself to act, this inconsistency proves only that the use of the phrase 'acting through the Chief of Engineers' is not a reliable guide to congressional intent on subdelegation.  Because the statutory language is ambiguous, we must decide whether the Secretary's interpretation is reasonable. . . .  We conclude that the Secretary's interpretation is reasonable for several reasons.  First, Congress has used the same language in other statutes that contemplate responsibility for a duty at a level below the Chief's.  Second, the magnitude of the task of issuing permits suggests that Congress intended to allow subordinate Corps officials to issue permits and specify permit conditions." (emphases added, citations omitted)).

**2.      Balko is Not Excluded From FCUA Whistleblower Protection Because of her Fiduciary Duties or the Content of her NCUA Disclosures**

**a.      <u>Balko is a Covered Employee</u>**

The whistleblower provision of 12 U.S.C. § 1790b extends to all employees who engage in protected activity, with two specific exceptions for employees who "(1) deliberately cause[] or participate[] in the alleged violation of law or regulation, or (2) knowingly or recklessly provide[] substantially false information to such an agency or the Attorney General."  12 U.S.C. § 1790b(d).

UNFCU does not argue that Balko falls into either of the two statutory exception categories; rather, UNFCU argues that Balko is not covered by the statute's protection "because all of her communications were in furtherance of her carrying out her responsibilities as CEO," that is, "keeping NCUA examiners apprised of such issues was an essential part of [Balko's] job." (Dkt. No. 35: UNFCU Br. at 9.)  In support of this argument, UNFCU relies on <u>Wolf</u> v. <u>Pacific National Bank</u>, No. 09-21531-CIV, 2010 WL 5888778 at *10 (S.D. Fla. Dec. 28, 2010), <u>report & rec. adopted</u>, 2011 WL 772853 (S.D. Fla. Feb. 28, 2011), which held that for purposes of whistleblower claims brought under 12 U.S.C. § 1831j, "'a plaintiff does not engage in protected activity by disclosing violations of law as part of [her] job responsibilities.'" (UNFCU Br. at 9.)  The <u>Wolf</u> court relied on three cases, <u>see</u>  <u>Wolf</u> v. <u>Pac. Nat'l Bank</u>, 2010 WL 5888778 at *10, which construed or relied upon the Whistleblower Protection Act ("WPA").  <u>See</u>, <u>e.g.</u>, <u>Sassé</u> v. <u>U.S. Dep't of Labor</u>, 409 F.3d 773, 779-80 (6th Cir. 2005) (discussing <u>Willis</u> v. <u>Dep't of Agric.</u>, 141 F.3d 1139, 1144-45 (Fed. Cir. 1998), in which "the Federal Circuit held that a Department of Agriculture employee, whose job it was to review farms for compliance with USDA regulations, did not engage in a protected activity under the Whistleblower Protection Act ('WPA'), by reporting that seven farms were out of compliance,"

since he "'did no more than carry out his required everyday job responsibilities'" (citation omitted));

Huffman v. Office of Personnel Mgmt., 263 F.3d 1341, 1351-53 (Fed. Cir. 2001) (construing WPA

to exclude whistleblowing that was part of normal job responsibilities), superseded by statute,

Whistleblower Protection Enhancement Act of 2012, Pub. L. No. 112-199, § 101(b)(2)(C), 126 Stat.

1465, 1465-66.

      In 2012, however, Congress overruled the reasoning of those cases by adding

subsection (f) to the WPA, which states that an employee is not excluded from whistleblower

protection simply because her "disclosure is made during the normal course of duties."  5 U.S.C. §

2302(f)(2); see also, e.g., Leshinsky v. Telvent GIT, S.A., 942 F. Supp. 2d 432, 449 (S.D.N.Y. 2013)

("In rejecting the Federal Circuit's narrow reading of the WPA, Congress made crystal clear its

intent that any whistleblower who reports misconduct via one of the enumerated channels be

protected under federal whistleblower statutes.").

      Accordingly, there is no merit to UNFCU's argument that Balko should be excluded

from whistleblower protection under the FCUA because her disclosures may have been made in the

normal course of her employment duties, and the Court rejects this argument.[35]

---

[35]    In the specific context of FCUA whistleblower claims, several courts have allowed
retaliation claims by employees whose duties included ensuring compliance with NCUA
regulations.  See, e.g., Averett v. Chi. Patrolmen's Fed. Credit Union, No. 06 C 4606, 2007
WL 952034 at *1 (N.D. Ill. Mar. 27, 2007) (plaintiff employee was "tasked with reviewing
[defendant's] policies and procedures to ensure compliance with National Credit Union
Administration ('NCUA') rules and regulations"); Fain v. Transmission Builders Fed. Credit
Union, No. 04-CV-0354, 2005 WL 2126778 at *1, *3 (S.D. Ind. Sept. 1, 2005) (vice
president of operations who "exercise[d her] responsibility to report regulatory violations
to the relevant authority" participated in protected activity when she "cooperat[ed] with the
NCUA investigation"); Garrett v. Langley Fed. Credit Union, 121 F. Supp. 2d 887, 892-93
(E.D. Va. 2000) (plaintiffs were vice presidents of defendant credit union when disclosures
made); Simas v. First Citizens' Fed. Credit Union, 996 F. Supp. 76, 80-81 (D. Mass. 1998)
(Summary judgment for defendant.  "The NCUA conducted its annual audit of [defendant
                        (continued...)

b.      **The Content of Balko's Disclosures is Covered**

UNFCU next argues that Balko is not entitled to whistleblower protection because her "communications with NCUA examiners were centered on internal Credit Union governance disputes," which UNFCU asserts "are <u>not</u> activities that are protected by the FCUA's whistleblower protection provisions."  (Dkt. No. 35: UNFCU Br. at 8-9.)   UNFCU characterizes Balko's disclosures as follows:

> (1) in 2006, communications relating to issues with UNFCU's Charter[;] (2) in 2009, communications relating to UNFCU's "dysfunctional management"—primarily the Board of Directors' involvement in Credit Union's day-to-day operations—as well as issues relating to "internal control" deficiencies in UNFCU's SBB branch; (3) in Fall 2011, communications relating to unauthorized activities and possible fraud in UNFCU's SBB branch; and (4) in February 2012, communications relating to the imminent violation of the NCUA's Member Business Loan ("MBL") regulatory threshold of 12.25% of assets.

(UNFCU Br. at 4 n.3.)  The Court finds this argument to be factually incorrect and in any event meritless.

As a factual matter, Balko's NCUA disclosures concerned more than UNFCU internal governance disputes, as evidenced by the events that followed her disclosures.  The NCUA responded to Balko's 2006 disclosure regarding UNFCU operating under a dual-charter, by requiring the situation to be cured within three months.  (<u>See</u> page 3 above.)  Balko's 2009 disclosures concerned, among other things, unlawful activity at the SBB branch, as well as among the UNFCU Board.  Those disclosures concerning the UNFCU Board were not merely about "in-fighting," as

---

35/      (...continued)
credit union] in January, 1994.  [Plaintiff] contacted the NCUA again, this time identifying himself.  Although it was routine for the auditors to meet with the plaintiff given his position as Vice President of Collections, [plaintiff] contends that the frequency of these meetings, including meeting with a single auditor in his office, was unusual for an annual audit." (citations omitted)), <u>vacated</u>, 170 F.3d 37 (1st Cir. 1999).

characterized by UNFCU.  (<u>See</u> UNFCU Br. at 9.)  Indeed, the NCUA examination that followed Balko's 2009 disclosures resulted in a ten-page list of Examiner's Findings detailing "violations of law or regulation" discovered during the examination.  (<u>See</u> pages 4-5 above.)  Further, the NCUA issued a Letter of Understanding mandating implementation of a new governance model as a result of the "significant adverse conditions" identified during the NCUA examination.  (<u>See</u> pages 5-6 above.)  Similarly, Balko's 2011 disclosures regarding fraudulent activity at the SBB branch resulted in NCUA Examiner Sullivan's recommendation that a forensic audit was necessary.  (<u>See</u> page 7 above.)  The audit reports confirmed at least some amount of fraudulent activity, and indicated other potential violations of law or regulation, including that employees were "threatened, vandalized, assaulted and harassed in connection with the investigation."  (<u>See</u> pages 8-10 above.)  Finally, Balko's 2012 disclosure regarding the potential violation of the NCUA 12.25% regulatory threshold was in fact confirmed by a June 2012 NCUA Examination Report.  (<u>See</u> page 12 above.)

Accordingly, some or all of Balko's disclosures concerned "any possible violation of any law or regulation" within the meaning of the FCUA whistleblower provision.  <u>See</u>, <u>e.g.</u>, <u>Kittel</u> v. <u>C-Plant Fed. Credit Union</u>, No. 08-CV-00114, 2010 WL 1949675 at *1, *3 (W.D. Ky. May 13, 2010) (plaintiff engaged in protected activity when she reported potentially fraudulent account activity); <u>Averett</u> v. <u>Chi. Patrolmen's Fed. Credit Union</u>, No. 06 C 4606, 2007 WL 952034 at *2, *6 (N.D. Ill. Mar. 27, 2007) (plaintiff engaged in protected activity when she "expressed her concerns about [credit union] senior management's attendance at Supervisory Committee meetings to NCUA examiner" and when she "spoke with NCUA representatives about . . . senior management's attempts to 'sidestep' NCUA rules and regulations"); <u>Garrett</u> v. <u>Langley Fed. Credit Union</u>, 121 F. Supp. 2d 887, 892-93, 898-900 (E.D. Va. 2000) (emphasizing "that the whistleblower statute employs the word 'possible,'" court found plaintiffs who "reported 'unsafe or unsound' business practices"

45

including internal governance issues regarding chains-of-command, proper allocation of duties, and

access to the credit union's board of directors "did in fact report information 'regarding any possible

violation of any law or regulation'").[36]

**B.**      **Material Issues of Fact Exist Regarding Whether UNFCU Terminated Balko in Retaliation for Providing Information to the NCUA**

Assuming without deciding that Balko must satisfy the but-for causation standard to

survive summary judgment on the third element of her claim (see page 24 n.17 above), the Court

finds that material issues of fact exist as to whether Balko was terminated in retaliation for her

NCUA disclosures.

---

[36]     The NCUA's issuance of the 2009 Letter of Understanding is itself significant evidence that Balko's 2009 disclosure fell within the ambit of the FCUA whistleblower protection.  See 12 U.S.C. § 1786(b)(1) ("Whenever, in the opinion of the [NCUA] Board, any insured credit union is engaging or has engaged in unsafe or unsound practices in conducting the business of such credit union, . . . or is violating or has violated an applicable law, rule, regulation, order, or any condition imposed in writing by the [NCUA] Board . . . , the Board shall serve upon the credit union a statement with respect to such practices or conditions or violations for the purpose of securing the correction thereof."); see, e.g., Simas v. First Citizens' Fed. Credit Union, 996 F. Supp. 76, 81 (D. Mass. 1998) ("As a result of this audit, the NCUA issued a letter of understanding and agreement to be signed by the members of the Board of Directors of [defendant credit union] which read, in part: 'The examination disclosed the presence of adverse conditions and trends.  If left unresolved, these problems will jeopardize the financial condition and/or operations of the [defendant] Credit Union.'  Included within these problems was the granting of a member business loan . . . 'without the support of a comprehensive written Member Business Loan program.'" (citation omitted)), vacated, 170 F.3d 37 (1st Cir. 1999); cf., e.g., Bingham v. Nat'l Credit Union Admin. Bd., 927 F.2d 282, 283 (6th Cir.) ("In July 1989, a Letter of Understanding and Agreement was entered into by the credit union . . . and the NCUA. . . . [T]he purpose of the agreement was to cause the credit union's board of directors to take the actions necessary to correct deficiencies in the operation of the credit union."), cert. denied, 502 U.S. 817, 112 S. Ct. 72 (1991); Vensure Fed. Credit Union v. Nat'l Credit Union Admin., 798 F. Supp. 2d 1, 2 (D.D.C. 2011) ("NCUA had noted several deficiencies, and in March 2009, [plaintiff] signed a letter of understanding with NCUA to correct these deficiencies. . . . Despite the March 2010 letter stating [plaintiff] was in full compliance, NCUA noted within that same letter that 'the [NCUA] plans to continue to work closely with [plaintiff] to ensure the continued vitality of [its] credit union.'").

Causation can be established either directly through evidence of retaliatory animus or indirectly by demonstrating that the adverse employment action followed quickly on the heels of the protected activity or through other evidence such as disparate treatment of fellow employees. See, e.g., Kwan v. Andalex Grp. LLC, 737 F.3d 834, 845 (2d Cir. 2013); Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 224 (2d Cir. 2001); DeCintio v. Westchester Cnty. Med. Ctr., 821 F.2d 111, 115 (2d Cir.), cert. denied, 484 U.S. 965, 108 S. Ct. 455 (1987).[37]

## 1.    Balko's Allegations are Sufficient to Establish a Prima Facie Claim

Balko's evidence shows that she was terminated by the UNFCU Board ten days after she informed them that she was reporting UNFCU's violation of the 12.25% MBL threshold to NCUA Examiner Sullivan.  (See pages 12-13 above.)  This close temporal proximity is sufficient to allow an inference of the causation element of her retaliation claim.  E.g., Kwan v. Andalex Grp. LLC, 737 F.3d at 845 ("The three-week period from [plaintiff's] complaint to her termination is sufficiently short to make a prima facie showing of causation indirectly through temporal proximity."); Summa v. Hofstra Univ., 708 F.3d 115, 127-28 (2d Cir. 2013); McNett v. Hardin Cmty. Fed. Credit Union, 118 F. App'x 960, 965 (6th Cir. 2004) (plaintiff "raised a genuine issue regarding whether his involvement in protected activity caused his termination" where he "was terminated only 13 days after he met with the NCUA examiner"); Kittel v. C-Plant Fed. Credit Union, No. 08-CV-00114, 2010 WL 1949675 at *4 (W.D. Ky. May 13, 2010) ("The Court also finds that [plaintiff] has satisfied the [causation] element because the decision to terminate her was made

---

[37]    See also, e.g., Kwan v. Andalex Grp. LLC, 737 F.3d at 845 ("[T]he but-for causation standard does not alter the plaintiff's ability to demonstrate causation at the prima facie stage on summary judgment or at trial indirectly through temporal proximity."); Wesley-Dickson v. Warwick Valley Cent. Sch. Dist., 10 Civ. 2428, --- F. Supp. 2d ----, 2013 WL 5338516 at *18 (S.D.N.Y. Sept. 24, 2013) (same).

a week after [defendant] learned that the results of the NCUA examination had to be disclosed to [defendant's] bonding company.").[38/]   In addition, Balko has presented other evidence that her termination was in retaliation for her complaints to the NCUA examiners.

------------------------------------------------

[38/]   See, e.g., Feingold v. New York, 366 F.3d 138, 156-57 (2d Cir. 2004) (issue of fact as to retaliation causation where supervisors recommended terminating plaintiff two weeks after his complaint); Treglia v. Town of Manlius, 313 F.3d 713, 721 (2d Cir. 2002) ("The temporal proximity between [platintiff's] protected activity in February 1998 and the allegedly adverse employment actions in March 1998 is sufficient to establish the required causal link for a prima facie case."); Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 224 (2d Cir. 2001) ("Although the plaintiff filed her complaint with the EEOC on February 4, 1994, the complaint was not served on [defendant] until the beginning of April 1994.  She was suspended later that month.  This time span is short enough to permit a jury to infer a causal connection."); Cifra v. Gen. Elec. Co., 252 F.3d 205, 217 (2d Cir. 2001) (causal connection established where plaintiff was fired "just 20 days after [defendant] learned that she had hired an attorney to pursue her claim of gender discrimination"); Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir. 1996) (causal connection "was shown in this case by, among other things, evidence that the time between the plaintiff's initial complaint and her discharge was a mere twelve days"); see also, e.g., Benussi v. UBS Fin. Servs. Inc., 12 Civ. 1261, 2014 WL 558984 at *10 (S.D.N.Y. Feb. 13, 2014) (finding but-for causation standard satisfied where defendant "terminated [plaintiff's] employment within eleven days of her report of the offensive comment"); Guzman v. News Corp., 09 Civ. 09323, 2013 WL 5807058 at *20-21 (S.D.N.Y. Oct. 28, 2013) (seven-month gap was not "too temporally remote to create an inference of retaliation"); Esmilla v. Cosmopolitan Club, 936 F. Supp. 2d 229, 245 (S.D.N.Y. 2013) ("Plaintiff states . . . that she made her complaints to [defendant] on several occasions, including in December 2007, early January 2008, and again on February 5, 2008.  Plaintiff was terminated shortly thereafter, on February 14, 2008.  At least at this stage, this is sufficient evidence of 'temporal proximity' to defeat Defendant's challenge to Plaintiff's ability to make out a prima facie case of retaliation." (citations omitted)); Scelfo v. Aurora Concept Inc., 02 Civ. 7835, 2006 WL 336038 at *18-19 (S.D.N.Y. Feb. 10, 2006) (Plaintiff "argues that the timing of her termination, one day after OASES completed its investigation of [defendant], is enough to raise the inference that the two events are connected, and that her involvement was a reason for her discharge.  Additionally, [plaintiff] testified that, only minutes after she talked to OASES agents during the on-site investigation, [defendant] told her not to attend a meeting that she usually attended, and said that the reason was that he did not 'trust her' . . . . [P]laintiff has proffered sufficient evidence to permit a trier of fact to find a causal connection . . . . Accordingly, summary judgment must be denied."); Dodson v. CBS Broad. Inc., 02 Civ. 9270, 2004 WL 1336231 at *25 (S.D.N.Y. June 15, 2004) (Peck, M.J.) (Plaintiff's "evidence that he was terminated within days of complaining to [defendant] about sex discrimination is so close in time to allow an inference of the causation element of his retaliation claim, without more.").

> **2.      Material Issues of Fact Exist Regarding Whether Balko's Termination**
> **Would Have Occurred in the Absence of Retaliatory Motive**

UNFCU asserts that Balko was terminated "as a result of her conduct in connection with the processing, approval and closing of a substantial MBL to the former Chairman of the Board of Directors, Walter Drobenko—her consistent and close ally on the Board of Directors."  (Dkt. No. 35: UNFCU Br. at 10-11.)  UNFCU primarily relies on three allegedly misleading aspects of Balko's January 26, 2012 MBL Board presentation: (1) Balko's representation that the loan would have a six percent interest rate when it had a 5.25% rate; (2) Balko's representation that granting the loan would not cause UNFCU to exceed the NCUA 12.25% MBL threshold, which it ultimately did; and (3) Balko's representation that the loan complied with UNFCU's internal MBL policies when it did not.  (UNFCU Br. at 11-17; Dkt. No. 41: UNFCU Reply Br. at 8-13.)  Balko asserts that questions of fact remain as to whether UNFCU's stated reasons have any basis in fact and whether they actually motivated her termination.  (Dkt. No. 38: Balko Opp. Br. at 17-23.)

To establish a factual issue as to whether the articulated reason was pretextual under the but-for causation standard, Balko must show "that the adverse action would not have occurred in the absence of the retaliatory motive," but this "does not require proof that retaliation was the only cause of the employer's action."  Kwan v. Andalex Grp. LLC, 737 F.3d 834, 846 (2d Cir. 2013); see cases cited on page 23 above.  Assuming without deciding that UNFCU has articulated a legitimate, nondiscriminatory reason for terminating Balko, the circumstances surrounding the MBL and NCUA reports raise material issues of fact from which a reasonable juror could infer that Balko would not have been terminated in the absence of retaliatory motive.

First, Balko has submitted evidence raising an issue of fact as to what interest rate was reflected in the file when she made the Board presentation.  Balko has presented evidence

suggesting UNFCU's Lending Manager may have falsely manufactured a January 11, 2011 5.25%

interest rate commitment letter during the Special Meeting in which the Board voted to terminate

Balko's employment, as evidenced by the fact that it was not in the loan file and was purportedly

retrieved from her office, that the date was handwritten over an older draft date, and that it was not

signed by anyone but the Lending Manager.  (See pages 12-13 above.)  Additionally, UNFCO's

Chief Financial Officer was present on January 11, 2012 when the Loan Review Committee

purportedly set the 5.25% rate, and on January 26, 2011 when Balko presented the six percent rate

to the Board, yet he did not raise the discrepancy when it occurred.  (See Dkt. No. 37: Balko Rule

56.1 Counter-Stmt. ¶ 280.)[39/]

        Second, Balko has submitted evidence sufficient to raise an issue of fact as to

whether she knew or should have known that the NCUA 12.25% MBL threshold would be violated

if the loan were issued and deliberately misinformed the UNFCU Board that the issuance of the

MBL would not put UNFCU in violation.  The commercial loan reports issued by the Loan Review

Committee from January to March 2012 show that UNFCU was below the threshold when Balko

made her presentation.  (See Balko Rule 56.1 Counter-Stmt. ¶¶ 298-304, 317.)  To the extent that

UNFCU was in danger of exceeding the 12.25% limit, a number of precautions could be taken to

---

[39/]    Cf., e.g., McNett v. Hardin Cmty. Fed. Credit Union, 118 F. App'x 960, 965 (6th Cir. 2004)
        (Plaintiff "has presented sufficient evidence to create a genuine issue of material fact
        regarding whether the given reasons for his termination were pretextual.  The incident
        involving [plaintiff's] telling [the] CEO . . . that he did not wish to report to [the] Lending
        Manager . . . occurred months before he was terminated.  While [the CEO] claims that he
        was upset about the issue at the time and that he placed a disciplinary memo in [plaintiff's]
        personnel file, [the CEO] never told [plaintiff] that he was upset about the event or that he
        had placed a memo about the event in his file.  Rather, the first time the memo was shown
        to anyone was after [plaintiff] had met with the NCUA examiners.").

avoid the violation, which Balko and the Board knew since they had been utilized in the past.  (See Balko Rule 56.1 Counter-Stmt. ¶¶ 309, 311, 319-22.)

Third, Balko has submitted evidence sufficient to raise an issue of fact as to whether her representations regarding UNFCU's MBL policy during the January 26, 2012 Board presentation were in fact a basis for her termination.  As an initial matter, the evidence does not reflect that Balko misrepresented the MBL policy, which allows loans to Board members on a case-by-case basis subject to Board approval.  (See page 12 above.)  In light of the fact that no Board member objected to the MBL, it is unlikely that Balko's representation on this issue would be enough to motivate her termination.[40]

Even if UNFCU's purported reasons were factually accurate and could have motivated Balko's termination, Balko has submitted contextual evidence of UNFCU's conduct sufficient to raise material questions as to whether she would have been terminated in the absence of a retaliatory motive.  There is evidence reflecting UNFCU's disdain for NCUA involvement in general and for Balko's role in facilitating that NCUA involvement in particular, as reflected by, inter alia: (1) Salenko's resistence to the new Governance Model, implemented pursuant to the NCUA's Letter of Understanding, which would divest the Board of improper control over UNFCU (see pages 6-7 above); (2) UNFCU's prior attempt to terminate Balko's employment immediately following her 2009 disclosures and the resulting 2009 NCUA examination report (see page 6 above); (3) UNFCU's efforts to discourage Balko from reporting possible violations to the NCUA including

---

[40]    Cf., e.g., McNett v. Hardin Cmty. Fed. Credit Union, 118 F. App'x at 965 ("[I]t is debatable whether the letter sent to members of the credit union's board, which was not rude or offensive, would be enough to cause the credit union to terminate [plaintiff].  [Plaintiff] has thus created a genuine issue of material fact about whether the credit union's proffered non-discriminatory reasons for his firing were pretextual.").

explicit remarks by Salenko expressing a desire not to involve the NCUA (see page 7 above); (4) UNFCU's efforts to frustrate the fraud investigation at the SBB branch as reported in the CLA Audit Reports, noting that employees were "threatened, vandalized, assaulted and harassed in connection with the investigation," and December 21, 2011, noting that "a significant number of original source documents are missing, either destroyed, misplaced, or never retained" (see pages 8-9 above); and (5) the manner in which the Board voted to terminate Balko without letting her respond to the allegations, in contravention of UNFCU's normal procedure for making such a determination (see page 13 above).

Based on the evidence described above, coupled with the temporal proximity between Balko's February 2012 NCUA report and the UNFCU Board's March 2012 termination decision, the Court finds that a reasonable juror could infer that UNFCU's purported reasons for Balko's termination are pretextual and that Balko's NCUA reports were a but-for cause of her termination. E.g., Summa v. Hofstra Univ., 708 F.3d 115, 129-31 (2d Cir. 2013); Kwan v. Andalex Grp. LLC, 737 F.3d at 846-47 ("A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action.   From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason. . . . Temporal proximity alone is insufficient to defeat summary judgment at the pretext stage.   However, a plaintiff may rely on evidence comprising her prima facie case, including temporal proximity, together with other evidence such as inconsistent employer explanations, to defeat summary judgment at that stage.   Based on the discrepancies between the EEOC statement and subsequent testimony, a reasonable juror could infer that the explanation given by the defendant was pretextual, and, that, coupled with the temporal proximity between the complaint and the

termination, the September 3 complaint was a but-for cause of [plaintiff's] termination. Viewing the evidence in the light most favorable to the plaintiff, as required on a motion for summary judgment, there is sufficient evidence to require denial of the summary judgment motion on the claims for retaliation." (citations omitted)); <u>Perez</u> v. <u>Progenics Pharm., Inc.</u>, 10 Civ. 8278, --- F. Supp. 2d ----, 2013 WL 3835199 at *11-12 (S.D.N.Y. July 24, 2013) ("Defendant relies on its theory that Plaintiff was terminated because of 'insubordination' for refusing to explain how he obtained the Wyeth Update, and argues that this intervening act severs any causation from the protected activity. However, according to Plaintiff's testimony, there was no insubordination, because [defendant] never gave Plaintiff an opportunity to answer the question. In order to weigh these competing narratives, the Court would have to evaluate the credibility of Plaintiff and [defendant], a task outside the Court's domain at the summary judgment stage. . . . Further, evidence that . . . Plaintiff and [defendant] had a 'hostile' encounter prior to any discussion of his access to the Wyeth Update can be considered as evidence that Plaintiff was terminated because of the protected activity. . . . Thus, drawing reasonable inferences in the light most favorable to Plaintiff, the Court finds that Defendant has failed to demonstrate by clear and convincing evidence that it would have terminated Plaintiff even in the absence of his protected activity." (fn. & citation omitted)); <u>Leshinsky</u> v. <u>Telvent GIT, S.A.</u>, 942 F. Supp. 2d 432, 451 (S.D.N.Y. 2013) ("The record leaves little doubt that legitimate frustrations with Plaintiff played a large role in his firing. However, it is not <u>beyond genuine dispute</u> that legitimate reasons <u>alone</u> motivated Plaintiff's firing."); <u>Esmilla</u> v. <u>Cosmopolitan Club</u>, 936 F. Supp. 2d 229, 249 (S.D.N.Y. 2013) ("The apparent inconsistencies between Defendant's formal disciplinary policies and how Plaintiff was treated, together with the temporal proximity of Plaintiff's purported complaints and her termination, are enough to create a triable issue

of fact as to whether Defendant's stated reason for terminating Plaintiff's employment was pretextual.").[41/]

        Accordingly, UNFCU is not entitled to summary judgment since material issues of fact exist regarding the but for causation element of Balko's FCUA retaliation claim.  See, e.g., McNett v. Hardin Cmty. Fed. Credit Union, 118 F. App'x at 965 ("The incident involving [plaintiff]

---

[41/]    See, e.g., Sass v. MTA Bus Co., No. 10-CV-4079, 2014 WL 585418 at *4 (E.D.N.Y. Feb. 14, 2014) (A "reasonable jury could find, even under the more stringent Nassar [but-for] standard, that Plaintiff's termination would not have happened had he not engaged in protected activity."); Benussi v. UBS Fin. Servs. Inc., 12 Civ. 1261, 2014 WL 558984 at *11 (S.D.N.Y. Feb. 13, 2014) ("The applicable standard of 'but-for' causation does not preclude a finding of pretext. . . . [A] reasonable jury could conclude that the termination decision was not made until after [plaintiff's] November 12 email.  Furthermore, a jury could conclude that the November 12 email amounted to the 'final straw' that convinced [plaintiff's] supervisors to terminate her.  Indeed, [plaintiff] alleges that [her supervisor] said 'we don't want this hanging over our head.'  Thus, a reasonable jury could conclude that had [plaintiff] not complained about the offensive comment, her supervisors would not have ultimately decided to terminate her."); Smith v. Town of Hempstead Dep't of Sanitation, No. 08-cv-3546, --- F. Supp. 2d ----, 2013 WL 6064826 at *7 (E.D.N.Y. Nov. 16, 2013); Puglisi v. Town of Hempstead Sanitary Dist. No. 2, No. 11-CV-0445, 2013 WL 6061984 at *6 (E.D.N.Y. Nov. 15, 2013) ("In addition to the undisputed temporal nexus . . . , Plaintiff also has offered evidence demonstrating that he was subjected to a series of employment actions that were, at least, inconvenient and annoying . . . . [T]he extensiveness of the pattern of adverse actions also gives support to a finding of but-for retaliation."); Guzman v. News Corp., 09 Civ. 09323, 2013 WL 5807058 at *21 (S.D.N.Y. Oct. 28, 2013) (temporal proximity and evidence of plaintiff being treating differently than another employee "support[] a finding that Plaintiff would not have been fired but-for her complaints" and are "sufficient for a jury to find a 'but-for' causal connection"); see also, e.g., Dodson v. CBS Broad. Inc., 02 Civ. 9270, 2004 WL 1336231 at *26 (S.D.N.Y. June 15, 2004) (Peck, M.J.) (Plaintiff "has satisfied his burden of raising an issue of material fact that [defendant's] proffered reason was a pretext for retaliation." (collecting cases)); Scheiner v. N.Y.C. Health & Hosps., 152 F. Supp. 2d 487, 497, 503 (S.D.N.Y. 2001) (summary judgment denied where "there are genuine issues of material fact with respect to whether the charges against the plaintiff were justified" and "with respect to whether the defendants took adverse personnel action against the plaintiff for disclosing information to a governmental body"); Ritz v. Town of E. Hartford, 110 F. Supp. 2d 94, 100 (D. Conn. 2000) (summary judgment denied where "there is at least a genuine issue of material fact as to whether there was a casual connection between plaintiff's whistle-blowing activities, the reorganization, and the ultimate elimination of his position").

telling [the] CEO . . . that he did not wish to report to [the] Lending Manager . . . occurred months before he was terminated.  While [the CEO] claims that he was upset about the issue at the time and that he placed a disciplinary memo in [plaintiff's] personnel file, [the CEO] never told [plaintiff] that he was upset about the event or that he had placed a memo about the event in his file.  Rather, the first time the memo was shown to anyone was after [plaintiff] had met with the NCUA examiners.  Similarly, it is debatable whether the letter sent to members of the credit union's board, which was not rude or offensive, would be enough to cause the credit union to terminate [plaintiff].  [Plaintiff] has thus created a genuine issue of material fact about whether the credit union's proffered non-discriminatory reasons for his firing were pretextual."); Simas v. First Citizens' Fed. Credit Union, 170 F.3d 37, 52 (1st Cir. 1999) ("[A]lthough the evidence of yet other adverse employment actions may be less compelling, it is not so obviously makeweight as to compel inferences in defendants' favor. . . . While social ostracism alone is rarely actionable, professional ostracism may be, at least where the plaintiff can show that defendants incited or encouraged coworkers to shun him, and plaintiff suffered some material harm resulting from his inability to consult with his colleagues on matters of business. . . . Since we are required to assess defendants' conduct in context and in totality, rather than piecemeal, we conclude that summary judgment on the FCUA claim was improvidently granted, and must be vacated." (citations omitted)).[42/]

---

[42/]   See also, e.g., Kittel v. C-Plant Fed. Credit Union, No. 08-CV-00114, 2010 WL 1949675 at *5 (W.D. Ky. May 13, 2010) ("While [plaintiff] may have been terminated for all three reasons that [defendant] asserts, its inconsistent responses raise a question as to what reason actually motivated the termination.  Therefore, [plaintiff] has satisfied her burden of presenting an issue of fact as to whether [defendant's] justifications are merely pretext for retaliation.  Consequently, [defendant] is not entitled to summary judgment . . . ."); Garrett v. Langley Fed. Credit Union, 121 F. Supp. 2d 887, 903 (E.D. Va. 2000) (denying summary judgment where credit union's "conduct is precisely what Congress sought to target when it enacted the FCUA's credit union employee protection remedy").

Accordingly, UNFCU's summary judgment motion should be DENIED.

## IV.   <u>PUNITIVE DAMAGES</u>

In addition to compensatory damages, Balko seeks punitive damages "due to the malicious nature of the actions taken by [UNFCU] and certain of its directors, officers and employees in discriminating and retaliating against" her.  (Dkt. No. 1: Compl. Wherefore Clause ¶¶ b-d.)  UNFCU seeks to dismiss Balko's punitive damages claim as a matter of law.  (Dkt. No. 35: UNFCU Br. at 23-24; Dkt. No. 41: UNFCU Reply Br. at 13.)

The FCUA whistleblower statute's remedies provision provides as follows:

If the district court determines that a violation of subsection (a) of this section has occurred, it may order the credit union . . . which committed the violation--

(1) to reinstate the employee to his former position,

(2) to pay compensatory damages, or

(3) take other appropriate actions to remedy any past discrimination.

12 U.S.C. § 1790b(c)(1)-(3).  The parties dispute whether punitive damages are available under § 1790b(c)(3).  (UNFCU Br. at 23-24; Dkt. No. 38: Balko Opp. Br. at 23-25; UNFCU Reply Br. at 13.)

UNFCU argues that Congress's "use of the disjunctive 'or'" makes clear that the remedies are alternatives, and thus "[i]t is not within the Court's powers to order all three possible remedies."  (UNFCU Br. at 23; <u>see</u> UNFCU Reply Br. at 13.)  In opposition, Balko argues that it would be "absurd" to read Congress's "use of the word 'or'" as requiring the Court "to effectively choose one single form of relief for a prevailing plaintiff, while foreclosing all others." (Balko Opp. Br. at 23-24.)  The Court agrees, and concludes that Congress's separation of the subsections with the word "or" does not preclude courts from granting more than one of the three enumerated

categories of relief.  <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Zahavi</u>, 12 Crim. 288, 2012 WL 5288743 at *4 (S.D.N.Y. Oct. 26, 2012) ("[I]n statutes, a seemingly disjunctive 'or' can often signify 'such as' or 'including.'"); 1A <u>Sutherland Statutory Construction</u> § 21:14 (7th ed. 2013) ("The word 'or,' while normally used to indicate disjunctive clauses, is often interpreted to mean the conjunctive if this is more consistent with the legal intent.").

UNFCU also argues that Congress's use of the phrase "to remedy any past discrimination" precludes punitive damages from the ambit of "other appropriate actions," since "punitive damages are designed to punish the alleged offender, and to deter <u>future</u> wrongdoing." (UNFCU Br. at 24; <u>see</u> UNFCU Reply Br. at 13.)  Balko responds that subsection (c)(3) is a catchall provision and use of the phrase "to remedy past discrimination" is not "a 'clear direction' from Congress" as would be required to preclude the availability of punitive damages.  (Balko Opp. Br. at 24-25.)  The Court finds Balko's argument persuasive and, for the reasons set forth below, concludes that punitive damages are available under 12 U.S.C. § 1790b.

In <u>Franklin</u> v. <u>Gwinnett County Public Schools</u>, 503 U.S. 60, 112 S. Ct. 1028 (1992), the Supreme Court articulated "[t]he general rule . . . is that absent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute."  <u>Id.</u> at 70-71, 112 S. Ct. at 1035.[43/]  Federal courts should "presume the availability of all appropriate remedies unless Congress has expressly indicated

---

[43/] <u>Accord</u>, <u>e.g.</u>, <u>Barnes</u> v. <u>Gorman</u>, 536 U.S. 181, 189, 122 S. Ct. 2097, 2102 (2002); <u>Bell</u> v. <u>Hood</u>, 327 U.S. 678, 684, 66 S. Ct. 773, 777 (1946) ("[W]here legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done."); <u>see</u>, <u>e.g.</u>, <u>Adeleke</u> v. <u>United States</u>, 355 F.3d 144, 149 (2d Cir. 2004); <u>Stoner</u> v. <u>Young Concert Artists, Inc.</u>, 11 Civ. 7279, 2012 WL 4471602 at *4 (S.D.N.Y. Sept. 26, 2012); <u>R.B.</u> v. <u>Bd. of Educ. of City of N.Y.</u>, 99 F. Supp. 2d 411, 417 (S.D.N.Y. 2000); <u>Oldroyd</u> v. <u>Elmira Sav. Bank, F.S.B.</u>, 956 F. Supp. 393, 401 (W.D.N.Y. 1997), <u>vacated in part</u>, 134 F.3d 72 (2d Cir. 1998).

otherwise." Franklin v. Gwinnett Cnty. Pub. Schs., 503 U.S. at 66, 112 S. Ct. at 1032; accord, e.g., Oldroyd v. Elmira Sav. Bank, F.S.B., 956 F. Supp. at 401.  This principle applies equally to statutes that are silent on remedies and those that enumerate remedies.[44]/

      Although the Second Circuit has not yet decided whether punitive damages are available under 12 U.S.C. § 1790b(c), courts relying on Franklin have held that punitive damages are recoverable under 12 U.S.C. § 1790b(c)(3) and the identical FIRREA provision, 12 U.S.C. § 1831j(c)(3), given the absence of a clear directive from Congress.  See, e.g., Averett v. Chi. Patrolmen's Fed. Credit Union, No. 06 C 4606, 2007 WL 952034 at *3 (N.D. Ill. Mar. 27, 2007) ("Section 1790b does not provide any indication that Congress intended to exclude availability of punitive damages.  Indeed, the language of § 1790b(c)(3)—allowing district courts to 'take other appropriate actions to remedy any past discrimination'—suggests that Congress intended to provide district courts with broad discretion to craft appropriate remedies.  Defendants' initial argument fails as a result, and their motion is denied with regard to the availability of punitive damages under § 1790b."); McNett v. Hardin Cmty. Fed. Credit Union, No. 02 CV 7576, 2006 WL 2473000 at *2 (N.D. Ohio Aug. 24, 2006) (The § 1790b "language provides for 'other appropriate actions' and does not expressly exclude punitive damages.  Therefore, under Franklin, this Court may grant appropriate relief in an action brought pursuant to the FCUA, including punitive damages, because

---

[44]/   See, e.g., CV001 Richard T. Seymour, Am. Law. Inst. - Am. Bar Ass'n Continuing Legal Education: Retaliation 1561, 1589 (July 25-27, 2013) ("Defendants have previously argued that the principle set forth in Franklin applies only where Congress has been completely silent on remedies.  However, such a limitation cannot be reconciled with Franklin's holding that Congress needs to expressly bar a remedy before it will be considered unavailable. Rather, Franklin and Bell v. Hood express a strong Federal policy in favor of the broadest relief that could have been intended under the statutory language, and that broad remedial policy applies equally where Congress has been silent on remedies or has specified remedies.").

Congress has not expressly indicated otherwise.  For the reasons explained above, this Court holds that punitive damages are an available remedy under the FCUA's remedies provision for wrongful discharge." (citations omitted)); Oldroyd v. Elmira Sav. Bank, F.S.B., 956 F. Supp. at 401 ("Because neither the statutory language nor the legislative history provides any definitive indication that punitive damages are not permissible under Section 1831j, I find that 'other appropriate actions' may include punitive damages.").[45]

The Court is not persuaded by UNFCU's argument that § 1790b's use of the phrase "to remedy any past discrimination" constitutes "clear direction" from Congress that punitive damages do not fall within the ambit of the catchall phrase.  A similar argument was advanced and rejected by the First Circuit in the context of whistleblower retaliation under the Occupational Safety and Health Act:

> [Defendant], nonetheless, would have us find here "clear direction to the contrary" because the phrase "all appropriate relief" is succeeded by the words, "including rehiring or reinstatement of the employee to his former position with back pay."  This, we are told, evinces a Congressional intent to limit relief to those remedies expressly mentioned, or at least to the kinds of remedies mentioned. [Defendant] contends that given the express delineation of certain remedies, "[t]here is nothing to suggest that Congress affirmatively intended [] an expansive

---

[45]  Cf., e.g., Reich v. Cambridgeport Air Sys., Inc., 26 F.3d 1187, 1191 (1st Cir. 1994) ("We think Franklin strongly suggests that 'all appropriate relief' as written in § 11(c) embraces monetary damages as well as other relevant forms of relief normally available, Congress having provided no 'clear direction' to the contrary."); Butler v. S. Glens Falls Cent. Sch. Dist., 106 F. Supp. 2d 414, 421 (N.D.N.Y. 2000) ("[S]everal courts have determined that, pursuant to Franklin, punitive damages are included in the full panoply of remedies available under the Rehabilitation Act, absent clear direction from Congress.  In light of these authorities, plaintiff may be entitled to recover punitive damages from the individual defendants pursuant to § 504." (citations omitted)); Beckett v. Atlas Air, Inc., 968 F. Supp. 814, 824-25 (E.D.N.Y. 1997) ("Following this directive [from the Supreme Court in Franklin], a number of courts have found punitive damages available in actions for wrongful or retaliatory discharge under other statutes.  In light of this case law and the policy justifications . . . , the Court concludes that punitive damages are available (although not necessarily warranted) in this . . . wrongful discharge case." (citations omitted)).

interpretation" of § 11(c), and that double damages are therefore unauthorized under the OSH Act.

However, the key language of the OSH Act is broad.  It authorizes a court to "order all appropriate relief."  The further language including certain remedies, like reinstatement, indicates the availability of the named remedies, but does not purport to limit "all appropriate relief" to those remedies only.  The mere naming of certain included remedies neither suggests nor is a "clear direction" that other remedies are precluded.

We conclude that the phrase "all appropriate relief" under § 11(c) includes "monetary damages" as specifically held in Franklin.  Moreover, given the expansive language in Franklin . . . , it is difficult to exclude even exemplary damages where otherwise justified in particular circumstances.  Later, analogous federal statutes protecting "whistleblowers" expressly list exemplary damages as within the rubric of "all appropriate relief." . . .

. . . Under the broad and unequivocal language in Franklin, however, the absence of an explicit mention in the OSH Act would not seem enough to take from the courts their ""'power to utilize any of the procedures or actions normally available . . . according to the exigencies of the particular case.'"'  Where Congress itself has recognized, in these other statutes, that "all appropriate relief" may include exemplary damages, it is difficult to see why the mere omission of the specific reference should compel a narrower reading.

Courts have traditionally had the power in tort cases to award damages "larger than the amount necessary to reimburse actual monetary loss sustained or even anticipated by the plaintiff, and thus redress intangible elements of injury that are 'deemed important, even though not pecuniary in [their] immediate consequences[s].'"  And in circumstances where the defendant's misconduct was intentional or reckless, "punitive or exemplary damages are generally available."  Retaliatory discharge has been treated as an intentional tort.

Reich v. Cambridgeport Air Sys., Inc., 26 F.3d at 1191-92 (citations omitted); accord, e.g., Oldroyd

v. Elmira Sav. Bank, F.S.B., 956 F. Supp. at 401-02; see also, e.g., 82 John Bourdeau & Barbara J.

Van Arsdale, Am. Jur. 2d Wrongful Discharge § 234 (2d ed. 2014) ("Where the courts recognize

that the termination of an at-will employee in violation of public policy gives rise to an action

sounding in tort, punitive damages may generally be recovered." (fn. omitted)); cf., e.g., Morrissey

v. Nat'l Mar. Union of Am., 544 F.2d 19, 25 (2d Cir. 1976) ("[W]e see no justification for [the

district court's] ruling as a matter of law that the Union could not be held for punitive damages under the Landrum-Griffin Act.  Section 102 is proof enough that Congress intended that labor organizations could be civilly liable for violating § 101.  If punitive damages can be awarded against other defendants, they can be awarded against unions as well."); CV001 Richard T. Seymour, <u>Am. Law. Inst. - Am. Bar Ass'n Continuing Legal Education: Retaliation</u> 1561, 1590 (July 25-27, 2013) ("Following reasoning similar to that in <u>Franklin</u> and in <u>Bell</u> v. <u>Hood</u>, the Second Circuit has taken an expansive view of remedies for employers' violations of statutes intended to protect employees. . . . After canvassing the divided district court decisions, the Second Circuit stated that it agreed with some aspects of the district court's opinion, but 'we see no justification for his ruling as a matter of law that the Union could not be held liable for punitive damages under the Landrum-Griffin Act. Section 102 is proof enough that Congress intended that labor organizations could be civilly liable for violating § 101.  If punitive damages can be awarded against other defendants, they can be awarded against unions as well.'  Defendants have previously attempted to distinguish <u>Morrissey</u> by stating that the statutory language--providing 'for such relief (including injunctions) as may be appropriate'--has no sequence of specific words following the general grant of authority.  To the contrary, the statute recites 'including injunctions' as a specific example of relief.  If the Second Circuit had followed defendants' approach, it would have had to limit the general remedial provision to forms of prospective equitable relief, and could not have reached its result.  That is a clear indication that defendants' approach to statutory construction is unsustainable." (fn. & citation omitted)).[46]

---

[46]   Nor is the Court persuaded by the reasoning underlying the <u>Kittel</u> and <u>Schroeder</u> decisions cited by UNFCU.  (<u>See</u> UNFCU Br. at 24 & n.20.)  In <u>Kittel</u>, the court reasoned that <u>Franklin</u> was inapplicable to subsection (c)(3) because <u>Franklin</u> interpreted the phrase "'order (continued...)

Accordingly, the Court finds that punitive damages are recoverable under 12 U.S.C.

§ 1790b(c)(3), and thus UNFCU's summary judgment motion should be denied as to Balko's

punitive damages claim.[47/]

---

46/   (...continued)
other appropriate remedies,'" while subsection (c)(3) contains the phrase "'take other
appropriate actions,'" which the court held "does not imply the discretion to award punitive
damages," but rather "indicates the power to order injunctive relief." Kittel v. C-Plant Fed.
Credit Union, No. 08-CV-00114, 2010 WL 2106680 at *4 (W.D. Ky. May 24, 2010). The
Schroeder court's reasoning adopts UNFCU's argument and fashions the phrase "'to remedy
any past discrimination'" into a clear direction "that Congress did not contemplate an award
of punitive damages in connection with 12 U.S.C. § 1790(b)(C) [sic], but rather, specifically
restricted available remedies to those which remedy past conduct." Schroeder v. Greater
New Orleans Fed. Credit Union, No. CIV. A. 09-3647, 2012 WL 6020228 at *4-5 (E.D. La.
Dec. 3, 2012). The court in Schroeder found that because punitive damages may be used "'to
deter future wrongdoing,'" they necessarily are not available under subsection (c)(3). Id. at
*5. The Court declines to read into the statute a limitation that is not expressed, particularly
in light of Franklin's broad language and, accordingly, declines to adopt the reasoning of
either Kittel or Schroeder. Cf., e.g., FDIC v. Hickey, 757 F. Supp. 2d 194, 198 (E.D.N.Y.
2010) ("The court also rejects the Receiver's argument that FIRREA's statutory limitation
on damages to 'actual direct compensatory damages,' somehow precludes an award of
prejudgment interest. . . . There is no mention in the statute of prejudgment interest, and the
court declines to read such a section therein." (citation omitted)); Hanna v. WCI Cmtys.,
Inc., 348 F. Supp. 2d 1332, 1333 (S.D. Fla. 2004) (punitive damages unavailable where
statute's catchall provision specifically limited remedies to "'compensatory' damages"). This
Court also notes that under the readings urged by the Kittel and Schroeder courts, subsection
(c)(1)—providing for injunctive relief in the form of reinstatement—and subsection
(c)(2)—providing for compensatory damages to compensate for plaintiff's concrete losses
resulting from the past discrimination—would be rendered meaningless. See, e.g., United
States v. Robinson, 702 F.3d 22, 32 (2d Cir. 2012) (Referring to "'the cardinal rule that, if
possible, effect shall be given to every clause and part of a statute.'"), cert. denied, 133 S. Ct.
1481 (2013); United States v. Awan, 607 F.3d 306, 313 (2d Cir. 2010) ("'Canons of
[statutory] construction ordinarily suggest that terms connected by a disjunctive be given
separate meanings, unless the context dictates otherwise.'"); Mizrahi v. Gonzales, 492 F.3d
156, 164 (2d Cir. 2007) ("It is a standard canon of statutory construction that words
separated by the disjunctive are intended to convey different meanings unless the context
indicates otherwise. The canon usefully serves to avoid interpretations that render statutory
terms superfluous." (citation omitted)); see also cases cited on page 29 & n.22 above.

47/   Moreover, given the absence of governing Second Circuit caselaw on the availability of
punitive damages under § 1790b(c)(3), it is preferable to allow the issue to be presented to
                                                                        (continued...)

## CONCLUSION

For the reasons set forth above, UNFCU's summary judgment motion (Dkt. No. 31) should be <u>DENIED</u>.   The Joint Pretrial Order is due thirty days from this Report & Recommendation.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections.  <u>See also</u> Fed. R. Civ. P. 6.  Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Lewis A. Kaplan, 500 Pearl Street, Room 2240, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Kaplan (with a courtesy copy to my chambers).   Failure to file objections will result in a waiver of those

---

47/    (...continued)
the jury, presumably in a bifurcated fashion pursuant to Fed. R. Civ. P. 42(b).  <u>See</u>, <u>e.g.</u>, <u>TVT Records</u> v. <u>Island Def Jam Music Grp.</u>, 257 F. Supp. 2d 737, 746-47 (S.D.N.Y. 2003) ("It is undisputed that New York courts and courts of this Circuit have expressed a preference to bifurcate determinations of the availability and the amount of punitive damages so that financial information relevant to the latter issue does not unduly influence the former determination." (collecting cases)); <u>Simon</u> v. <u>Philip Morris Inc.</u>, 200 F.R.D. 21, 49-50 (E.D.N.Y. 2001) (Weinstein, D.J.) ("The trial court is free to consider arguments of the parties considering bifurcation of the general compensatory liability issue and the punitive damages issue.  Separating these issues for trial before the same jury may ensure the expeditious and economic resolution of this case.  Regardless of the jury's verdict, resolution of the compensatory liability issue could well end litigation of the other issues.  Severing compensatory liability and punitive damages may also be appropriate in this case because of the unusual complexity of the issues, which would be difficult to present to a jury simultaneously in comprehensible fashion." (citations omitted)); <u>Garrett</u> v. <u>Langley Fed. Credit Union</u>, 121 F. Supp. 2d 887, 906 (E.D. Va. 2000) (bifurcation appropriate in FCUA whistleblower case in light of "the question of punitive damages that may exist").  That way, a re-trial on the issue of punitives would not be necessary regardless of the Circuit's decision on the legal availability of punitives under § 1790b(c)(3).

63

objections for purposes of appeal.  Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985); Ingram v.

Herrick, 475 F. App'x 793, 793 (2d Cir. 2012); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d

1049, 1054 (2d Cir. 1993), cert. denied, 513 U.S. 822, 115 S. Ct. 86 (1994); Roldan v. Racette, 984

F.2d 85, 89 (2d Cir. 1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992), cert. denied, 506

U.S. 1038, 113 S. Ct. 825 (1992); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d

Cir. 1989); Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988); McCarthy v. Manson, 714

F.2d 234, 237-38 (2d Cir. 1983).

Dated:        New York, New York
              March 28, 2014

                                        Respectfully submitted,

                                        _____
                                        **Andrew J. Peck**
                                        United States Magistrate Judge

Copies ECF to:  All Counsel
                Judge Lewis A. Kaplan